**In re N.R. GUARANTEED RETIREMENT, INC., an Illinois corporation, Debtor.**

**Bankruptcy No. 89 B 10494.**

United States Bankruptcy Court, N.D. Illinois, E.D.

March 22, 1990.

---

David A. Golin, Mark Lieberman, Rosenthal and Schanfield, Chicago, Ill., for debtor.

Mitchell Jones, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for Firstmark.

Nathan Lichtenstein, Greenberg, Keele, Lunn & Aronberg, Chicago, Ill., for Superior Bank.

Timothy A. French, Neal, Gerber, Eisenberg & Lurie, Salvatore Barbatano, Rudnick & Wolfe, Chicago, Ill., for Netzky Partnership.

Richard Friedman, U.S. Trustee's Office, Chicago, Ill.

## AMENDED MEMORANDUM
## OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

There are currently pending before the court two motions that raise the recurring question of whether a Chapter 11 debtor filed its petition in good faith. N.R. Guaranteed Retirement, Inc. ("N.R."), the debtor, was incorporated less than three weeks before it filed its petition. Its only substantial asset is an office and retail building in downtown Chicago, with associated leases and a cause of action, burdened by two mortgages. This real estate was in foreclosure for several months prior to the bankruptcy filing, and the first mortgagee, which brought the foreclosure action, has moved for relief from the automatic stay, or dismissal of the entire case, asserting that the bankruptcy was filed in bad faith. The junior mortgagee has also filed a motion for relief from the stay. In order to decide these motions, the court requested written arguments of counsel, required both an appraisal of the property and submission of a plan and disclosure statement by the debtor, and conducted an evidentiary hearing. After considering these matters, the court has determined to grant relief to the moving creditors, for the reasons stated below.

## FINDINGS OF FACT

Most of the facts relevant to this decision are undisputed; the only significant issue in dispute is the value of the debtor's property.

*The property and its mortgages.* The property at issue here consists of about 8,000 square feet of land improved with a five-story office and retail building, in downtown Chicago (the "property"). The building on the property is about a hundred years old, and suffers from significant obsolescence in its layout and mechanical systems, as well as a lack of window access that cannot be corrected. However, the building has been well maintained and the location is favorable for development. Title to the property is in a land trust at Harris Trust and Savings Bank (Trust No. 40407, "the trust").

The property is encumbered by two mortgages, both of which are in default. The senior mortgage is held by Firstmark Standard Life Insurance Company ("Firstmark"). This mortgage secures a nonrecourse note, dated November 23, 1983, in the principal amount of $3.6 million. The note bears interest at 12% per annum, payable quarterly, with the entire principal due on December 29, 1991. The quarterly interest payments of $108,000 have been in default since September 1, 1988. When this bankruptcy case was filed, there was at least $4,032,000 owing on the Firstmark mortgage.

A second mortgage is held by Superior Bank FSB ("Superior"). This mortgage also secures a nonrecourse note from the trust, dated December 30, 1985, in the principal amount of $7.1 million. The note is payable with interest at 3½% over the one year treasury bill rate, adjusted annually, amortized over thirty years, but with a balloon payment on December 31, 1995. The debtor has scheduled the indebtedness on the Superior note at $7.01 million.

The prepetition claims of the two mortgagees, then, total at least $11.04 million.

*Ownership of the property: the Fanslow group.* The beneficial interest in the property, since 1981, has been held by a group of corporations controlled by Richard Fanslow. The "Fanslow group" includes: (a) Virick Limited ("Virick"), an Illinois corporation apparently wholly owned by Fanslow (see Exhibit D to N.R. complaint against Intercounty Title Co., *et al.*, No. 89 CH 5696 (Circuit Court, Cook County, Ill.)); (b) Nurses Guaranteed Retirement Life Insurance Company ("Nurses"), a Florida insurance corporation wholly owned by Virick; (c) Life Assurance Company of Pennsylvania ("LACOP"), a Pennsylvania insurance corporation, 99% of whose common stock is owned by Nurses; and (d) the debtor, N.R., wholly owned by Nurses.[1] The relationship of these corporations is reflected in the diagram set out below (at p. 4).

Originally, it appears, LACOP was the sole beneficiary of the trust; in December 1983, LACOP transferred the beneficial interest to Nurses. As of June 1989, the beneficial interest had been transferred to Virick, and, on June 5, 1989, Virick retransferred the interest to Nurses, as a capital contribution; Nurses, on the same day, transferred the beneficial interest, again as a capital contribution, to N.R.

*Foreclosure and the filing of the bankruptcy petition.* In November, 1988, Firstmark filed suit in state court to foreclose its mortgage on the property, naming among other defendants Virick, the Fanslow corporation that then held the beneficial interest in the trust. Virick and the other defendants moved to dismiss the foreclosure complaint, and, in response, Firstmark filed an amended complaint. The defendants countered with another motion to dismiss. There had still been no answer filed in the foreclosure action, when, on June 5, 1989, N.R. was incorporated and given the beneficial interest in the trust. On June 12, the state court ordered the defendants to answer the amended foreclosure complaint. On June

---

**1.** Fanslow submitted a declaration under penalty of perjury stating that he owns all of the stock of N.R. directly, but this assertion is contradicted by several of N.R.'s other filings, and appears to have been a mistake.

23, N.R. filed its chapter 11 petition, staying the foreclosure.

The parties stipulated that N.R. was formed in contemplation of filing the bankruptcy petition. According to N.R.'s disclosure statement, Virick transferred the property to N.R. because Virick "had assets other than those associated with the Property" and "[s]uch assets did not require the protection of chapter 11." The parties also stipulated that N.R. has no paid employees, that it pays no rent for its corporate headquarters (which are the headquarters of Virick and Nurses), and that its only business is the collection of the rental payments from LACOP.

*Transactions involving the property.* The Fanslow group participated in three transactions (in addition to the mortgages) that may affect the value of the property: an intercompany lease; an installment land contract with a leaseback; and a title insurance policy that has given rise to separate state court litigation. These transactions, described below, may be understood more readily by reference to the following diagram:

1. The LACOP lease. It appears that, since 1981, the Fanslow corporation managing operating the property has been LACOP. Until December 1983, LACOP was also the beneficiary of the land trust. In November 1983, just prior to transferring its interest in the trust to Nurses, LACOP entered into a lease of the property from the trust. This is a "triple net" lease, requiring LACOP to bear all expenses of operating the property. Originally, the lease called for monthly payments of $83,750, and terminated on December 31, 1991. By an amendment, dated December 19, 1985, the monthly rent was increased to $100,000 per month, and the term extended to December 31, 1996.

As reflected in the analysis of the appraiser retained by N.R., the LACOP lease is entirely uneconomic. Under the lease, LACOP pays an average of $34.00 per square foot annually for the rentable space in the building. LACOP itself occupies some of this space, estimated by the appraiser to be worth $14.00 per square foot. It rerents other space at rates ranging from $9.84 for office space to $23.82 for ground floor retail space. During 1989, the appraiser estimated that LACOP would receive annual net income of about $24,000 (including the income attributed to its own use of space) as compared to its annual rental payment to the trust of $1,200,000. Even assuming that the property will be

rerented at progressively higher rates in the future, the appraiser has projected annual net income to LACOP of no more than $350,000 during the term of the lease. Thus, the LACOP lease appears to be a vehicle for transferring funds (approximately $1 million annually) from LACOP to whatever entity holds the beneficial interest in the trust.[2]

2. The Netzky sale/leaseback. In December 1984, Nurses, the Fanslow corporation then holding beneficial interest in the land trust, entered into an "Installment Agreement for Trustee's Deed," with the Netzky Family Partnership ("Netzky"), an Illinois partnership. This agreement required Nurses to cause the land trustee to convey the property to Netzky, upon Netzky's payment of $10 million.[3]

Originally the final closing was set for June 30, 1992, but the agreement was amended in January 1985 to advance the closing date to January 2, 1990. The agreement was amended again, on August 17, 1989 (after the filing of this case), to push the date back to January 2, 1994.

The Netzky agreement provides that Netzky will have possession of the property pending final closing. At the same time, Netzky is obligated to make monthly interest payments at the rate of 11.5% per annum on the $10 million purchase price (i.e., $95,833 per month) until the closing. However, Netzky also agreed to lease back the property to Nurses. This lease originally called for Nurses to make monthly rental payments to Netzky of $108,333 and for Netzky to make monthly contributions to operating expenses of $20,833—a net payment to Netzky of $87,500. Offsetting this net rental payment against the interest that the agreement calls for Netzky to pay on its purchase results in a net monthly payment from Netzky to Nurses of $8,333.

When the installment agreement was first amended, in January 1985, the rental payments to Netsky were decreased to $104,583. This had the effect of increasing Netzky's net monthly payment to $12,083. Finally, in the post-bankruptcy amendment to the installment agreement, the rental payments were returned to the original level, and Netzky's monthly expense contribution was reduced to $12,500—exactly the amount by which the rent exceeds the purchase payment—together with a $24,000 annual payment. Considering the annual payment on a monthly basis, Netzky's net monthly payment under the sale/leaseback was thus reduced to $2,000. The impact of the agreements and amendments can be summarized as follows:

| Agreement | Date of Agreement | Date for Conveyance | Netzky Interest Pymt | Netzky Expense Cntrb | Rent Payable to Netzky | Net Netzky Payment |
|---|---|---|---|---|---|---|
| Original Sale/Lease | 12–28–84 | 6–30–92 | $95,833 | $20,833 | $108,333 | $ 8,333 |
| First Amendment | 1–2–85 | 1–2–90 | $95,833 | $20,833 | $104,583 | $12,083 |
| Post-filing Amendment | 8–17–89 | 1–2–94 | $95,833 | $14,500 | $108,333 | $ 2,000 |

3. The title company dispute. According to a complaint now pending in state court, Nurses deposited $3.8 million in an escrow with Intercounty Title Company of

---

**2.** The LACOP lease appears to provide that the rights of the trust, as lessor, may be freely assigned, even to purchasers at a foreclosure sale. (Lease (part of Debtor's Group Ex. 5) §§ 2201, 2901).

**3.** It is undisputed that Netzky would take the property subject to the mortgages. The First-mark mortgage anteceded the Netzky transactions, and Netzky has executed a "Certificate and Agreement of Subordination" acknowledging that its interest in the property is subordinate to the Superior mortgage.

Illinois ("the title company"), in December 1985, in return for which the title company agreed (1) to make all the payments on the mortgage now held by Firstmark and (2) to issue a title insurance policy to a second mortgagee, in which the first mortgage would not be shown as a title exception. The state court complaint further alleges that the title company failed to make payments of the first mortgage, causing that mortgage to go into default. The complaint seeks, among other things, specific performance of the alleged agreement by the title company to pay the Firstmark mortgage, on behalf of both the trust and N.R.

No evidence was submitted that would allow the court to determine the likely outcome of the title company litigation or otherwise place a value on this litigation as an asset of N.R.

*Valuation of the property.* As noted earlier, N.R. and its creditors disagree about what value should be attributed to the property for purposes of the pending motions. Only one appraisal was submitted—that of an expert retained by N.R., Eugene Stunard. Stunard gave three different valuations of the property: (1) the "base" value of the property, without considering either the LACOP lease or the Netzky sale/leaseback; (2) the value of the property with the LACOP lease in place, but without considering the Netzky transaction; and (3) the value of the property, with the LACOP lease in place, subject to the Netzky transaction.

For each of these assessments of value, Stunard's approach was the same. He found that the highest use of the property would be as part of a new development, which could occur no earlier than the end of 1994. (Appraisal, Debtor's Ex. 1, at 52.) Accordingly, Stunard (a) determined what the property (as vacant land) would be worth at the end of 1994, and reduced this amount to present value in order to obtain a "reversion" value; (b) estimated the annual net income that the property would generate through the end of 1994, and reduced these estimates to present value in order to obtain a "net income" value; and

(c) added the reversion value and the net income value to obtain the final appraised value. The assumptions and methodology of this overall approach were not challenged by any of the parties, and the court accepts them. However, the court cannot accept each application of this approach.

1. Base value. Considering only the underlying tenant leases (including attributed rent for the space occupied by LACOP), Stunard estimated the present value of the net income that would be generated by the property, through the end of 1994, at about $1 million. He estimated that, at the end of 1994, the value of the property, for development, would be between $13 and $20 million, which he discounted to a present reversion value of about $7 million. Thus, his appraisal of the base value of the property was $8 million. This appraisal also was not challenged and is accepted by the court.

2. Value with the LACOP lease. If the income from the LACOP lease is considered, the value of the property is obviously higher, since this lease requires payment of approximately $1 million more, each year, than the property generates in underlying tenant rentals. Accordingly, in appraising the property with the LACOP lease in place, Stunard recalculated the "net income" component of his appraisal. Stunard recognized that a "higher level of risk" would be involved in the receipt of the LACOP payments because the rent on this lease "far exceeds the total net rental value of the subject building in the market," and thus that the financial condition of LACOP "becomes an important underwriting factor." (Appraisal at 102.) To account for the risk of LACOP's being financially unable to make lease payments, Stunard discounted the LACOP lease income to present value using a discount rate 2% higher than the one he employed for the income from underlying tenant leases. (*Id.* at 103.) This resulted in an income component of $4.5 million, $3.5 million more than the "base" income, which, when added to the reversion value of $7 million, resulted in an appraisal, with the LACOP lease in place, of $11.5 million.

However, Stunard's calculation of income under the LACOP lease entirely failed to consider a risk more significant than LACOP's financial condition, *i.e.*, the risk that LACOP would simply refuse to honor the lease. If the lease were held by a third-party purchaser, honoring the lease would result in a $1 million annual loss to the Fanslow group. This would provide a powerful incentive to seek termination of the lease, on whatever grounds might be available. Because the lease was between companies controlled by the same management, these arguments might be premised on further amendments, oral understandings, and so forth, that a prospective purchaser could not ascertain in advance of litigation.

The likelihood of a third-party purchaser actually receiving full payment from LACOP as due under the lease is minimal. Such a purchaser, faced with the expense, delay, and uncertainty of litigating over the lease payments, would likely be willing to accept a very substantial discount from the $3.5 million in additional value calculated by Stunard. Estimating this discount at 50%, the court finds that the LACOP lease adds approximately $1.75 million to the base value of the property, resulting in a total value, with the LACOP lease, of $9.75 million.[4]

3. Value subject to the Netzky transaction. The impact of the Netzky transaction is to cap at $10 million the value of the property to N.R., as of the end of 1993.[5] This necessarily reduces the "reversion" component of Stunard's appraisal, since that component was based on the property being worth between $13 to $20 million at the end of 1994. Stunard's written appraisal did not consider the impact of the Netzky transaction. However, in his testimony, he estimated that this transaction would reduce by $900,000 the amount that the property would otherwise be worth with the LACOP lease in place.

A somewhat smaller reduction is appropriate. If the reversion value is recalculated, with the $10 million amount discounted for four years, at 12%, the result is a value of about $6.25 million, $750,000 less than the reversion value Stunard otherwise found.[6] When this amount is subtracted from the $9.75 million value otherwise presented by the property with the LACOP lease in place, the result is a total value of the property, subject to the Netzky transaction, of $9 million.

*The proposed plan.* On September 11, 1989, acting under court order, N.R. filed a plan and disclosure statement. The plan proposes to pay the secured creditors the amount of their allowed secured claims, pursuant to restructured notes. The Firstmark note would be extended so as to require payment of the principal on December 31, 1994, instead of December 29, 1991, and the interest rate would be changed from 12% to a rate equivalent to the yield on treasury bonds maturing in January 1995, plus 1%, determined on the date of confirmation. (Currently, this would produce a rate less than 10%; at the time the plan was proposed, the rate would have been less than 9%.) The restructured Superior note would have the same payment

4. In coming to this finding, the court did not consider the Netsky transaction as a measure of the value of the property with the LACOP lease in place. The appraiser did not consider it as evidence of market value, and there was no evidence presented that would allow a finding the transaction was negotiated at arm's length. Nevertheless, the $10 million Netzky purchase price is consistent with the court's assessment.

5. Under the Seventh Circuit's decision in *In re Streets & Beard Farm Partnership*, 882 F.2d 233 (7th Cir.1989), the effect of the installment contract was to leave N.R. "hold[ing] legal title in trust solely as security for the payment of the purchase price."

6. The following is the reversion formula applied by Stunard (Appraisal at 104) using a future value of $10 million at the end of 1993:

| | |
|---|---|
| Future value: | $10,000,000 |
| Times: Present value factor at 12 percent (4 years) | 0.620260 |
| Present value: | $6,202,600 |

In his calculations, Stunard deducted the cost of buying out a long term lease from the future value of the property. This is not required for the present calculation because Netzky is required to pay $10 million regardless of this lease. The 12% discount rate is the lowest rate employed by Stunard in discounting reversion value, but a relatively low discount rate is appropriate in light of the relative certainty of the purchase price.

date and interest terms as the new Firstmark note, thus accelerating the payout one year, reducing the current interest rate, and removing the amortization of principal. N.R. has indicated its belief that this proposed plan can be "crammed down" over any objections of Firstmark and Superior.

*History of the pending motions.* Firstmark presented its motion for dismissal of the bankruptcy case, or relief from the automatic stay, on August 23, 1989, and stipulated to continuance of the hearing on the motion to allow for the appraisal of the property. By the time of the final hearing, on October 25, 1989, Superior had filed its own motion for relief from the stay, which was heard at the same time. The court has had the matter under advisement since that time.

## LEGAL CONCLUSIONS

*Jurisdiction.* Motions for relief from the automatic stay are among the "core" matters that may be determined on a final basis by a bankruptcy judge, upon referral by the district court. 28 U.S.C. § 157(b)(2)(G). Motions to dismiss, since they plainly effect the administration of the estate, are also core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A). All such matters have been referred to the bankruptcy court of this district by Rule 2.33(a) of the local general rules.

■ *The problem of good faith.* The pending motions for relief from stay and dismissal are grounded on the assertion that the debtor, N.R., did not file this case in good faith. Neither Section 362(d) of the Bankruptcy Code (11 U.S.C., "the Code"), which provides grounds for relief from the automatic stay, nor Section 1112(b), which sets forth grounds for dismissal of a Chapter 11 case, contain any provision requiring that a *case be filed* in good faith. This absence of an explicit "good faith" requirement for filing stands in sharp contrast to the Code provisions for plan confirmation—Sections 1129(a)(3), 1225(a)(3), and 1325(a)(3)—all of which explicitly require that the *plan be proposed* in good faith. Nevertheless, the courts have read a good

faith filing requirement into Chapter 11, based on two considerations.

First, prior to the adoption of the Code, a substantial body of case law required good faith in the filing of any reorganization case under the Bankruptcy Act, whether or not such a requirement was contained in the statutory language. The pre-Code "good faith filing" decisions are discussed in *In re The Bible Speaks*, 65 B.R. 415, 420–22 (Bankr.D.Mass.1986) and in *In re Victory Construction Co.*, 9 B.R. 549, 552–54, 568–69, *modified on other grounds*, 9 B.R. 570 (Bankr.C.D.Cal.1981), *vacated as moot*, 37 B.R. 222 (BAP 9th Cir.1984) (setting forth a compilation of the decisions in an appendix).

Second, the specific grounds for relief set forth by Sections 362(d) and 1112(b) are not exclusive. Each section allows relief to be granted "for cause," and then sets forth specific grounds as among those "included" within "cause." Section 102(3) of the Code confirms that the words "includes" and "including" are not limiting, and the legislative history of Section 1112(b) gives further indication that Congress intended the courts to grant relief for just reasons other than those specified in the statutory language. Referring to the specific grounds set forth by the statute, both the House and Senate reports state:

> The list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 405 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 117 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5903, 6361. Thus, nothing in the Code prevents courts from granting relief from the stay or dismissal of a case on the basis of a lack of good faith in filing.

There are, in fact, scores of Chapter 11 cases in which relief from stay has been granted or dismissal ordered because the case was filed in bad faith. *See In re Little Creek Development Co.*, 779 F.2d 1068, 1072 n. 2 (5th Cir.1986) (listing a number of the decisions through 1985); *In*

*re HBA East, Inc.*, 87 B.R. 248, 258–62 (Bankr.E.D.N.Y.1988) (discussing several more recent decisions). The Seventh Circuit noted this line of cases with approval in *In re Madison Hotel Associates*, 749 F.2d 410, 426 (1984) ("It is generally recognized that 'good faith' is a threshold prerequisite to securing Chapter 11 relief ... and that the lack of such good faith constitutes 'cause' sufficient for dismissal under 11 U.S.C. § 1112(b)."), and the Seventh Circuit has itself enforced a good faith filing requirement, under identical statutory provisions, in the context of Chapter 13. *In re Smith*, 848 F.2d 813, 816 n. 3 (7th Cir.1988); *In re Rimgale*, 669 F.2d 426, 431–33 (7th Cir.1982). District and bankruptcy court decisions from the Northern District of Illinois have repeatedly used a lack of good faith in filing as a basis for granting relief. *In re Mandalay Shores Cooperative Housing Association, Inc.*, 63 B.R. 842, 849 (N.D.Ill.1986); *In re Schlangen*, 91 B.R. 834, 839 (Bankr.N.D.Ill.1988); *In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 926 (Bankr.N.D.Ill.1982).

Teaching of such substantial weight must, of course, be honored, but the teaching is hard to apply. Some courts, in probing the good faith of a filing, have attempted to ascertain the mental state of the individuals who filed. *See, e.g., In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir.BAP 1983) (reviewing the conduct of the debtor's principals, both before and after the case was filed, to determine whether they had "an intent to cause hardship or to delay creditors ... without an intent or ability to reorganize," *i.e.*, "an improper state of mind"). Other courts have suggested that objective factors, rather than the motivation of the debtor or its principals, should be the primary focus in determining the good faith of a filing.

> Section 1112(b) and its associated "good faith" doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case. On that score dismissal of a Chapter 11 petition—like dismissal of any lawsuit—is not imposed principally as a sanction of bad intentions or obstreperous behavior.

> Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks.

*Mandalay Shores*, 63 B.R. at 848. Thus, instead of a consistent rule, the principal guidance offered by the decisions involving "good faith filing" are varying lists of factors, some bearing on objective factors such as the likelihood of a successful reorganization, and some bearing on the mental state of those filing the case. One frequently quoted list of factors is from *In re Little Creek Development Co.*, 779 F.2d 1068, 1072–73 (5th Cir.1986):

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following considerations usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property. There are sometimes allegations of wrongdoing by the debtor or its principals. The "new

debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases.

Although lists of this sort accurately reflect factors that have been considered important in the decisions, they are entirely non-prescriptive. One court, introducing a similar list of "[f]actors the bankruptcy court may consider" frankly acknowledged that "there is no particular test for determining whether a debtor has filed a petition for reorganization in good faith." *In re Natural Land Corp.*, 825 F.2d 296, 298 (11th Cir.1987). This state of the law understandably leads to frustration, reflected in one judge's suggestion that the Code does not require good faith in Chapter 11 filings. *In re Gulph Woods Corp.*, 84 B.R. 961, 971 (Bankr.E.D.Pa.1988) (referring to good faith inquiries as "purely subjective broadside attacks upon debtors").

*Distinct grounds for relief within the "good-faith filing" inquiry.* A review of the Chapter 11 decisions in which lack of good faith in filing is cited as ground for relief suggests that, instead of a single good faith inquiry, the courts have actually responded to several distinct grounds for relief, stemming from different concerns and reflected in differing factual circumstances. By dealing with these grounds separately, it is possible to develop more consistent and predictable tests of "cause" for dismissal or relief from stay than the lists of good-faith factors. At least four of these distinct grounds for relief may be implicated by the pending motions.

1. Improper impact on non-bankruptcy rights: the need for the bankruptcy filing. The most basic "good faith" ground for dismissal of a Chapter 11 case is that the filing is unnecessary. A truly unnecessary Chapter 11 case imposes improper burdens both on creditors and on the bankruptcy system. The creditors are arbitrarily required to accept rights in bankruptcy in place of their property rights under non-bankruptcy law (at the very least, the automatic stay is imposed upon them), and the

bankruptcy system is required to waste its resources, possibly interfering with the processes of other court systems.

Bankruptcy courts have thus been willing to consider creditors' motions for relief on the ground that a particular Chapter 11 case was filed without need for relief. In *In re Johns–Manville Corp.*, 36 B.R. 727 (Bankr.S.D.N.Y.1984), the court considered motions to dismiss filed on behalf of asbestos victims who allege that Manville had filed its bankruptcy simply in order to curtail its liabilities to them, without any need for bankruptcy protection. The court rejected this contention on the ground that the debtor was in fact "in pressing need of economic reorganization." 36 B.R. at 738. In *In re The Bible Speaks*, 65 B.R. 415 (Bankr.D.Mass.1986), the court considered a motion to dismiss filed by a creditor who alleged that her state court litigation against the debtor was stayed by an unnecessary Chapter 11 filing. The bankruptcy court rejected this argument based on a finding that the creditor's claim "may well exceed the value of the Debtor's assets" and "poses a threat to the Debtor's continued existence." 65 B.R. at 426.

Although *Manville* and *The Bible Speaks* did not grant relief, the principle that they suggest has been applied in a series of "supersedeas cases"—bankruptcy cases filed in order to obtain a stay, pending appeal, of a judgment entered against the debtor, where the debtor had failed to file a supersedeas bond. Although there was an apparent split of authority in the early decisions dealing with this situation, (*see In re Karum Group, Inc.*, 66 B.R. 436, 437 (Bankr.W.D.Wash.1986)), there now appears to be a generally accepted rule:

[A] Chapter 11 filing is in good faith and may be used to replace an appeal bond if the judgment against the debtor is so large that the debtor faces severe disruption of his business if enforcement of the judgment is not stayed. However, if the debtor has the ability to satisfy the judgment from non-business assets, then it is bad faith to attempt to use the bankruptcy laws to appeal without posting a bond.

*In re Holm,* 75 B.R. 86, 87 (Bankr.N.D.Cal. 1987). *Accord, In re Davis,* 93 B.R. 501, 503 (Bankr.S.D.Tex.1987). This rule would be equally applicable to situations like that in the *Manville* litigation: if the debtor's business could continue unimpaired, without a bankruptcy filing, a creditor whose rights are impacted by the filing has "cause" for relief, independent of the other factors listed in the decisions on good faith in filing.[7]

However, this rule must be applied cautiously. The Bankruptcy Code generally requires no particular financial hardship to support a voluntary filing. *See Johns–Manville,* 36 B.R. at 732 ("[W]ith specific regard to Chapter 11, the Code eliminates the requirement contained in former Sections 77(a), 130(1), 323 and 423 of the Act that the debtor be insolvent or unable to pay his debts as they mature."). The "cause" provisions of Sections 362(d) and 1112(b) should therefore not be applied to grant relief simply because the debtor cannot clearly articulate or convincingly prove its need for bankruptcy protection. The court in *In re Holm,* 75 B.R. 86, 87 (Bankr. N.D.Cal.1987) reflected this concern by implicitly putting the burden of proof on the creditors: "[A] Chapter 11 proceeding should be dismissed [due to its impact on non-bankruptcy rights] only if the debtor has the clear ability to survive without bankruptcy court protection."

 Indeed, there is every reason to presume that most Chapter 11 cases are filed because the debtors are in genuine need of bankruptcy protection. Such a filing imposes substantial costs on the debtor—increased legal and accounting expenses; loss of good will, potential loss of control of the business (through appointment of a trustee), public disclosure of the business's affairs, and diversion of staff time for bankruptcy matters. Debtors can be assumed not to incur these costs without reason. For this particular "cause," then, the burden of proof rests on the creditor to establish both that the debtor has no need of bankruptcy protection and that the bankruptcy filing substantially impacts the creditor's non-bankruptcy rights.

2. Recent transfer of assets: the "new debtor syndrome." A second "cause" for relief, and the dominant issue now before the court, is implicated by the creditors' argument that because N.R. was formed for the purposes of filing this bankruptcy case and because the property in issue was transferred to N.R. just before filing, this is a case of "new debtor syndrome," for which relief is required. The "new debtor syndrome" has, in fact, been cited as a cause for relief in many cases. *See, e.g., In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983); *In re Eighty South Lake, Inc.,* 63 B.R. 501, 507 (Bankr. C.D.Cal.1986) *aff'd by* 81 B.R. 580 (9th Cir. BAP 1987); *In re Yukon Enterprises, Inc.,* 39 B.R. 919, 921 (Bankr.C.D.Cal.1984); *In re Eden Associates,* 13 B.R. 578, 584 (Bankr.S.D.N.Y.1981); *In re Dutch Flat Investment Co.,* 6 B.R. 470, 471 (Bankr.N. D.Cal.1980). In each of these cases, as in the present one, the bankruptcy filing was made by an entity to which lien-encumbered property had recently been transferred, and which had few, if any, other assets.[8]

---

7. Some cases suggest that there is "bad faith," giving cause for dismissal, if the debtor is involved in a dispute with secured creditors that can be resolved in state court, and the timing of the debtor's bankruptcy filing indicates an attempt to avoid state court adjudication. *See, e.g., In re L'Puente Limited Partnership,* 104 B.R. 503, 504 (Bankr.S.D.Fla.1989). The timing of any bankruptcy filing may be relevant to determining whether the debtor acted to delay creditors unnecessarily (see p. 22, below), but there is nothing improper in a debtor's thwarting state court collection proceedings by filing a Chapter 11 petition, as long as reorganization is both needed and feasible. *See In re McStay,* 82 B.R. 763, 768 (Bankr.E.D.Pa.1988): "It is quite common and not inappropriate for a debtor to use chapter 11 to obtain a respite from a creditor or creditors aggressively seeking to collect on a debt, even when execution is imminent, provided that financial rehabilitation is possible.... Indeed, that is one of the underlying purposes which the bankruptcy process, by virtue of the automatic stay, was meant to serve."

8. The new debtor syndrome applies only in cases where encumbered property has been transferred. Transfers of unencumbered property would not cause creditors of the transferor to become creditors in a bankruptcy filed by the transferee. The "new debtor syndrome" does

Why should the new debtor syndrome give cause for relief? The decisions on good faith in filing frequently discuss the obligation that bankruptcy courts have to grant relief so as to further "the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy." *Little Creek,* 779 F.2d at 1072. Transfers of secured property to new debtors have significant potential for upsetting the balance built into the Code in two different respects.

First, the new debtor syndrome may involve an unnecessary bankruptcy, as discussed in the preceding section, and hence constitute "an abuse of the bankruptcy process ... offensive to the integrity of the bankruptcy system," *Yukon Enterprises,* 39 B.R. at 922, as well as an infringement of the non-bankruptcy rights of creditors. Although the costs associated with Chapter 11 can be presumed to deter most unnecessary Chapter 11 filings, the situation changes dramatically when lien-encumbered property is transferred to a new entity which thereafter files a bankruptcy petition. In such filings, the transferor gets the benefits of bankruptcy with respect to the transferred property (imposition of the automatic stay and potential restructuring of debt) without bearing the burdens of bankruptcy (disclosure of financial information, legal and accounting expenses, potential loss of control) with respect to its overall operations. Such a transferor may have no need for bankruptcy relief, and may be unwilling to bear the costs associated with filing a petition itself, but is not deterred by the lower costs involved in a filing by the "new" debtor.

Second, even if the transferor would have had need for bankruptcy relief, the transfer of encumbered assets followed by a "new debtor" filing may deprive secured creditors of rights in the assets and business operations that they would have had in the event that the transferor had filed.

Thus, in *Eden Associates,* the court dismissed Chapter 11 petitions filed by a new limited partnership which filed for relief within weeks of a purported transfer of property in foreclosure. 13 B.R. at 584–85. The court concluded that dismissal was particularly appropriate because "this debtor was formed, if at all, and the property purportedly conveyed to it, to shield the assets of ... more affluent companies from the jurisdiction of the Bankruptcy Court." 13 B.R. at 584–85. *Accord, In re Dutch Flat Investment Co.,* 6 B.R. 470, 471 (Bankr.N.D.Cal.1980) (dismissal appropriate where new debtor formed in order to forestall secured creditor's rights "while avoiding submitting the assets of the parent entities to the jurisdiction of the court").

The potential adverse effects on creditors from transfer to a new debtor are independent of most of the other factors listed in decisions on good faith filing. It does not matter, for example, whether the new debtor has an actual business, unsecured creditors, or the potential for a successful reorganization. The harm is that a bankruptcy filing by a new debtor (1) may conceal that fact that a bankruptcy filing by the transferor would have been unnecessary, and (2) may present assets and a business structure less favorable to the creditors than those of the transferor.

Of course, this harm may not occur in all cases; the transfer of unencumbered property to a new entity may be the result of a genuine need for reorganization in the transferor, and may have no adverse effect on the creditors secured by that property. In *In re Beach Club,* 22 B.R. 597, 598 (Bankr.N.D.Cal.1982), a piece of real property in foreclosure was transferred from the corporation that developed the property to a new limited partnership, which then filed a Chapter 11 petition. The court apparently found that there was a need for the parent corporation to seek bankruptcy protection with respect to the property in foreclosure, but that if the parent had itself

not, however, require that the entity filing for relief have been newly created. In *Eighty South Lake,* for example, the filing entity was actually

formed eight months before the transfer and bankruptcy filing, but for most of that time had been inactive. 63 B.R. at 503–04.

filed for relief, other properties in development by the parent would have been jeopardized. 22 B.R. at 598–99. For a number of reasons, including the fact that the transferred property carried a large equity cushion and that the transferor corporation was a general partner of the new debtor (thus exposing its assets to satisfaction of unsecured claims), the court found that the creditors' interests were not adversely affected by the transfer. Accordingly, the court declined to grant relief. 22 B.R. at 599–600. In *In re Northwest Recreational Activities, Inc.*, 4 B.R. 36, 43 (Bankr.N.D. Ga.1980), the transferred property had previously been operated by a corporation that "had a poor financial record ever since its creation" and which had recently taken "a turn for the worse." 4 B.R. at 37. The court found that the new debtor which took over operation of the property, and purchased its title from the former principals "submitted assets and financial resources" to the bankruptcy that were "no less than, perhaps more than" what would have been available from the transferor. *Id.* at 43. Accordingly, relief was also denied in this case.

Nevertheless, the potential for abuse in "new debtor" cases has caused most courts that have considered the matter—including those that have denied relief—to conclude that such filings are inherently suspect. *In re Beach Club*, 22 B.R. 597, 599 (Bankr. N.D.Cal.1982) ("[T]he court will always raise its eyebrows when a new debtor appears on the eve of a bankruptcy filing"); *In re Northwest Recreational Activities, Inc.*, 4 B.R. 36, 42 (Bankr.N.D.Ga.1980) (transfer of assets to newly formed entity and the filing of a Chapter 11 petition "is highly suspect as to jurisdiction over said entity and assets").

The court in *In re Yukon Enterprises, Inc.*, 39 B.R. 919, 921–22 (Bankr.C.D.Cal. 1984), synthesized the decisions in the "new debtor" cases by holding that a transfer of "distressed" property to the debtor "in close proximity to the filing of the case" creates a rebuttable presumption of bad faith, which can only be overcome if the debtor establishes (1) that the creditors' rights have not been adversely affected and (2) "that a reorganization is more likely than would have been the case prior to the transfer to the debtor." Because the new debtor syndrome removes many of the costs of bankruptcy that would otherwise be a check on unnecessary filings, and because of the potential for limiting creditors' access to assets, this test quite properly imposes the burden of proof on the "new" debtor. However, in three respects the test should be clarified.

First, the *Yukon* rule should apply in any case of a recent transfer of lien-encumbered property to the debtor, regardless of whether the property is "distressed" (*i.e.*, in foreclosure or at least subject to foreclosure), since the new debtor syndrome can be employed for improper purposes with respect even to non-distressed property. For example, an entity in no need of bankruptcy protection can employ a new debtor filing in order to reduce the interest rate on a mortgage that is completely current. The original owner would transfer its mortgaged property to a new entity, and cause that entity to file a Chapter 11 petition. Then, if relief were not accorded to the mortgagee, the new debtor might be able to "cram down" a plan in which the mortgagee was paid the amount of its claim on terms that included a market rate of interest on the mortgage, rather than a higher contract rate. *See In re Aztec Co.*, 107 B.R. 585, 587–88 (Bankr.M.D.Tenn. 1989) (holding that for purposes of cramdown under 11 U.S.C. § 1129(b)(2)(A)(i), "[a] plan provides 'value, as of the effective date of the plan' if the allowed amount of the secured claim is paid over time with interest at the 'market rate' for similar loans in the region").

Second, by referring to bad faith, the *Yukon* rule may invite non-prescriptive application of "good faith" factors such as those listed in the *Little Creek* decision. Because these factors are not necessary to decision in a case involving the "new debtor syndrome," it would be clearer to state the rule without reference to bad faith.

Finally, the second element of the *Yukon* rule (that the new debtor prove that a reorganization is "more likely" after trans-

fer than before) is not entirely clear. Apparently, this element requires the new debtor to show that its reorganization would be more likely to succeed than a hypothetical reorganization of the transferor. If this is its intent, the requirement is too stringent. Where a transferor is in need of reorganization—so that the secured creditors and the bankruptcy system would have had to bear the costs of a filing in any event—the only question should be whether the new debtor's filing puts the creditors in a worse position than the transferor's filing would have.

■ The rule for the new debtor syndrome, as a separate "cause" for relief under Sections 362(d) and 1112(b), can thus be stated as follows: once a secured creditor establishes that property securing its claim was transferred to the debtor shortly before the filing of a Chapter 11 petition, relief will be granted unless the debtor proves (1) that the transferor of the property was itself in need of bankruptcy relief and (2) that the rights of the creditor were not adversely affected by the debtor's filing instead of the transferor.

3. Inability to reorganize: Section 1112(b)(2). Another separate "cause" for relief, frequently discussed in the decisions on good faith in filing is the inability of the debtor to effectuate a plan. One of the factors listed in *Little Creek* as indicative of bad faith is "no available sources of income to sustain a plan of reorganization," 779 F.2d at 1073, and several decisions have granted relief, at least in part, on the ground that the debtor's bad faith was established by an inability to reorganize, *e.g., In re Schlangen*, 91 B.R. 834, 838 (Bankr.N.D.Ill.1988); *In re Herndon Executive Center, Inc.*, 36 B.R. 803, 807 (Bankr. M.D.Fla.1984). There is plainly an upset of the balance between debtors' and creditors' interests in bankruptcy if the Chapter 11 process is put into motion without the prospect for a confirmable plan. However, as

was pointed out in *In re Mandalay Shores Cooperative Housing Association, Inc.*, 63 B.R. 842, 848–49 (N.D.Ill.1986), there is no reason to consider ability to reorganize simply as one issue bearing on good faith in filing, because "inability to effectuate a plan" is itself one of the expressly enumerated grounds for dismissal. 11 U.S.C. § 1112(b)(2).[9]

■ There is a well-established body of case law dealing with the application of Section 1112(b)(2). *See Hall v. Vance*, 887 F.2d 1041, 1044 (10 Cir.1989) (collecting authorities). It has been held that the moving party bears the burden of establishing the debtor's inability to formulate or carry out a plan. *In re Sheehan*, 58 B.R. 296, 300 (Bankr.D.S.D.1986). Relief has most commonly been granted where the debtor was a corporate shell, with no real business activity. *Hall*, 887 F.2d at 1044.

4. Delay. There are a number of good faith decisions in which relief has been granted because the circumstances indicated that the debtor was proceeding in bankruptcy simply to delay creditors. For example, in *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D.Md.1983), the district court dismissed a chapter 11 case on bad faith grounds *sua sponte*, noting that the debtor was a defendant in a RICO action, and that he had filed his bankruptcy petition only after delaying the RICO trial first by failing to respond to discovery and then by making a tardy and ill-founded claim of "recent medical problems." Cases in which debtors have filed multiple bankruptcy cases might also be dismissed on grounds of bad faith in filing. *Cf. In re Metz*, 820 F.2d 1495, 1497 (9th Cir.1987) (multiple Chapter 13 filings are evidence of bad faith, but not conclusive). This aspect of the good faith filing cases is also reflected in one of the *Little Creek* factors: "Requirement of good faith prevents abuse of the bankruptcy process by debtors whose

---

9. An inability to reorganize would also constitute grounds for relief from the automatic stay, under the express language of Section 362(d)(2) of the Code, whenever the debtor lacked equity in the property at issue. *United Savings Association v. Timbers of Inwood Forest Associates,*

*Ltd.,* 484 U.S. 365, 376, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988) (requiring, in order to deny relief under Section 362(d), that there be "a reasonable possibility of a successful reorganization within a reasonable time").

overriding motive is to delay creditors without benefitting them in any way...." 779 F.2d at 1072.

■ However, once again, "unreasonable delay that is prejudicial to creditors" is an enumerated ground for relief, 11 U.S.C. § 1112(b)(3), and need not be considered simply as a factor bearing on good faith. Although most decisions under Section 1112(b)(3) have focused on the time taken by a debtor, after filing the case, to submit a confirmable plan, *see, e.g., In re C.J. Corp.,* 78 B.R. 273, 275 (Bankr.D.Haw. 1987) (case dismissed after no plan submitted in three years), pre-filing delay and failure to submit timely financial reports have also been cited as evidence of unreasonable delay under this "cause." *In re Chesmid Park Corp.,* 45 B.R. 153, 159 (Bankr.E.D.Va.1984). Decisions applying section 1112(b)(3) have established that the moving party has the burden of proof in establishing both unreasonable delay and prejudice. *In re Macon Prestressed Concrete Co.,* 61 B.R. 432, 436–37 (Bankr.M.D. Ga.1986).

■ Misstatements by the debtor can also produce unreasonable delay in proceedings. In its decision in *In re Rimgale,* 669 F.2d 426, 432–33 (7th Cir.1982), the Seventh Circuit set forth a number of factors to be weighed by the bankruptcy courts in assessing the good faith of debtors filing under Chapter 13. Several of these factors dealt with the accuracy of the debtor's factual representations, and one specifically addressed the issue of whether any inaccuracies "amount to an attempt to mislead the bankruptcy court." *Id.* at 432. In the context of Chapter 11, at least one bankruptcy court has indicated that misstatements in schedules may be considered as factors bearing on good faith. *In re Davis,* 93 B.R. 501, 503 (Bankr.S.D.Tex. 1987). Apart from causing delay, however, the mere fact that misstatements were made (as opposed to the impact of the actual facts) would not appear to bear on cause for dismissal or relief from stay. Rather, the appropriate remedies for misstatements by debtors in Chapter 11 would appear to be appointment of a trustee or examiner (authorized under Section 1104 of the Code for, among other things, "fraud" and "dishonesty" in the conduct of the debtor's affairs) or sanctions under Bankruptcy Rule 9011.

*The grounds for relief applied to the present case.* Three of the four causes for relief outlined above, as to which the creditors bear the burden of proof, have not been established here. However, the "new debtor syndrome" does require that relief be granted.

1. Need for bankruptcy filing. Although, as noted below, there is considerable question as to whether the Fanslow group would have required bankruptcy relief prior to the transfer of the property to N.R., there is little question that N.R. itself is unable to carry on business outside of bankruptcy. The mortgages on the property are in default, foreclosure is proceeding, and N.R. has no ability to bring the mortgages current.

2. Ability to effectuate a plan. In order to test the ability of N.R. to formulate a plan in this case, the court ordered N.R. to file a plan on an expedited basis. N.R. complied with the order. Although its plan is certainly subject to challenge, it would not be appropriate to require N.R. to demonstrate that its plan is confirmable in response to a motion under Section 1112(b)(2). Rather, that demonstration would properly take place at a confirmation hearing pursuant to Section 1128, at which N.R. would bear the burden of establishing all of the requirements for confirmation. *In re Sullivan,* 26 B.R. 677, 678 (Bankr.W.D.N.Y. 1982). The creditors, at this point, have not satisfied their burden, under Section 1112(b)(2), of demonstrating that N.R. lacks the ability to propose any confirmable plan.

3. Delay. The Fanslow group delayed the foreclosure proceedings in state court by filing two motions to dismiss, but this delay cannot be said to have been "unreasonable," particularly since Firstmark amended its complaint in response to the initial motion. During the pendency of this bankruptcy, N.R. took two other actions complained of by the creditors. First, it

failed to discuss the Netzky transaction in its disclosure statement (although its schedules did reflect that the property was "subject to an executory installment agreement for Trustee's Deed"). Second, it failed to obtain court approval for the post-bankruptcy amendment to the Netzky leaseback, which approval is required by Section 363(b) of the Code. Neither of these matters, however, has delayed the prosecution of this case.

■ 4. Pre-filing transfer/the new debtor syndrome. Counsel for N.R. have acknowledged that this case bears all the hallmarks of the new debtor syndrome. As noted above, to demonstrate cause for relief under the "new debtor" decisions, creditors must establish that a transfer of property securing their liens was made shortly before the bankruptcy was filed. That such a showing has been made here is conceded by N.R. To rebut the resulting presumption that relief is appropriate, N.R. must demonstrate (1) that the transferor of the property (Virick) was in need of bankruptcy relief and (2) that the secured creditors (Firstmark and Security) are not in a worse position because N.R. filed for Chapter 11 relief instead of Virick. N.R. has made neither showing.

Far from indicating that Virick would have needed to file bankruptcy because of its problems with the mortgages on the property at issue here, N.R. has asserted that Virick had assets that "did not require" bankruptcy protection. Indeed, Virick had, at a minimum, direct or indirect ownership of the other Fanslow group entities, including LACOP, which was able to make annual lease payments of $1 million in excess of the rental value of the property. It is entirely possible, based on the facts of this case, that Virick would have had no difficulty in paying the mortgages according to their terms, but chose a bankruptcy (filed by N.R.) as a means of reducing the interest rates paid on the mortgages. (The proposed plan, in fact, provides for such a reduction.) Because N.R. has not met its burden of demonstrating its transferor's need for reorganization, relief is required.

N.R. has also failed to show that the creditors have not been adversely affected by its filing of a Chapter 11 petition rather than Virick. N.R. has argued that its plan provides Firstmark and Superior with payment of the present value of their entire prepetition claims, and that, under Section 1129(b)(2)(A)(i) of the Code, they can never demand more than this, regardless of what entity files the bankruptcy petition. However, the plan submitted by N.R. does not have this effect. It proposes to pay the present value of each creditor's "allowed secured claim." As to Firstmark, whose claim is substantially oversecured, the allowed secured claim would be the full amount of the indebtedness under its mortgage. As to Superior, however, there is a different result. Superior has a claim of at least $7.1 million. The value of the property securing this claim is $9.75 million, subject to Firstmark's prior claim of more than $4 million. Superior is thus undersecured by at least $1.35 million. Unless Superior made an election pursuant to Section 1111(b), it would be treated as having an unsecured claim, in that amount, pursuant to Section 506(a). As a holder of an unsecured claim, Superior might well be in a better position with a bankruptcy filing by Virick, in light of Virick's potentially greater assets.

Moreover, even if N.R.'s plan actually did provide for full payment of both the secured and unsecured claims of Superior, N.R. would still be unable to demonstrate that Superior would not be better served by a Virick bankruptcy. This is because N.R.'s ability to consummate a "full payment" plan is highly questionable. To fund such a plan, N.R. would need to make monthly interest payments, at a market rate approved by the court, and then pay Firstmark and Superior a total of over $11 million. The court has found that the property owned by N.R., without considering the Netzky sale, is worth only $9.75 million. And to N.R., which holds the property subject to the Netzky transaction, the property is worth no more than $9 million. In the argument that followed the hearing in this case, counsel for N.R. suggested that this apparent shortfall would be made up from

the proceeds of N.R.'s state court action against the title company, but no evidence was presented to allow for any valuation of that lawsuit. Nor can the LACOP payments, even if they continue, allow for full payment.[10] N.R. has certainly not established its ability to make full payment of Superior's prepetition claims. Again, Virick may well have a greater ability to pay the claims. On this basis, too, relief is required under the "new debtor syndrome" rationale.

*Relief.* Both of the creditors in this case have moved for relief from the automatic stay. Due to the length of time that the court has had these motions under advisement, this relief has already gone into effect, pursuant to Section 362(e), *In re Wedgewood Realty Group, Ltd.,* 878 F.2d 693, 697–98 (3d Cir.1989), but the creditors have been gracious enough to delay action to enforce their liens pending this decision. The only question to be addressed now is whether dismissal also should to be ordered. In *In re Yukon Enterprises, Inc.,* 39 B.R. 919, 920–21 (Bankr.C.D.Cal.1984), the court suggested that termination of the automatic stay without dismissal was often the preferable remedy for creditors in "new debtor syndrome" cases, because this would prevent "transfer of the property to another 'new debtor' and the filing of an additional bankruptcy petition." Contrary to the experience reported by the *Yukon* court, however, multiple filings by "new debtors" has not been a problem in this district, and Rule 9011 should provide ample remedy should such abuse occur. Given that the property in question is the only reason for N.R.'s bankruptcy, there is no reason for this case to remain open while that property is foreclosed.[11]

## CONCLUSION

For the reasons stated above, the case will be dismissed on Firstmark's motion. Appropriate orders will be entered.

---

10. N.R. now receives $100,000 monthly from LACOP. Even if N.R. were allowed to service its debt at only 10% per annum (the approximate amount now called for by its plan), all but $100,000 of the LACOP income annually would be needed for debt service, and from that $100,000, N.R. would be required to pay its own lawyers and accountants, as well as any fees awarded by the court pursuant to Section 506(b) of the Code. The LACOP income cannot therefore be seen as a source of funds for principal reduction.

11. Conversion of this case to one under Chapter 7 is also a possible remedy, which should be considered by the court pursuant to Section 1112(b). *See In re Klein,* 100 B.R. 1004, 1008 (N.D.Ill.1989) (once cause for relief is shown under Section 1112(b), the court must exercise its discretion between conversion and dismissal). Again, however, because relief from the stay will remove the only significant asset in this case, conversion would serve no purpose.