In re DEVAULT MANUFACTURING COMPANY, Debtor.

JEFFERSON BANK, Plaintiff,

v.

DEVAULT MANUFACTURING COMPANY, Defendant.

Bankruptcy No. 79–620EG.

United States Bankruptcy Court, E. D. Pennsylvania.

Aug. 25, 1982.

Paul R. Rosen, Michael Minkin, Spector, Cohen, Hunt & Rosen, Philadelphia, Pa., for plaintiff.

Nathan Lavine, Adelman & Lavine, Philadelphia, Pa., and Hope, Portnoff & Grant, Paoli, Pa., for debtor.

Martin J. Aronstein, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Creditors' Committee.

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. Although the Bankruptcy Act has been superseded by the Bankruptcy Code as of October 1,

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue at bench is whether the creation and perfection of the creditor's security interest shortly before the debtor filed a petition for an arrangement under chapter XI of the Bankruptcy Act ("the Act") was a voidable preference under § 60 of the Act. We conclude that that security interest was not a voidable preference because the creditors' committee (and debtor) have failed to establish that the creditor had reasonable cause to believe that the debtor was insolvent at the time the security interest was created and perfected.

The facts of the instant case are as follows:[1] On April 10, 1979, Devault Manufacturing Company ("the debtor") filed a petition for an arrangement under chapter XI of the Act.[2] Prior to that time, the debtor and Jefferson Bank ("Jefferson") had had an ongoing business relationship which included various loans from Jefferson to the debtor and the maintaining of a corporate checking account by the debtor with Jefferson. During 1976 and 1977, Jefferson lent $200,000.00 to the debtor in exchange for which the debtor executed promissory notes. On December 14, 1978, Jefferson made a demand of the debtor to repay the entire $200,000.00 which was then in default. After negotiations, Jefferson agreed to extend the $200,000.00 loan while the debtor agreed to execute a security agreement on certain of its collateral. The debtor executed that agreement and delivered it to Jefferson on March 13, 1979. Thereafter, on March 21 and 22, 1979, Jefferson filed financing statements covering the above collateral, thereby perfecting its security interest in that collateral within twenty days of the date the debtor filed its petition under the Act.

1979, the provisions of the Act still govern petitions filed before that date. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 403, 92 Stat. 2683 (1978).

After the filing of the debtor's petition under chapter XI, Jefferson filed a complaint in reclamation seeking an order directing the debtor to deliver the collateral to Jefferson. The debtor raised several defenses to that complaint including the defense that the creditor and perfection of Jefferson's security interest was a voidable preference pursuant to section 60 of the Act. That section provides in relevant part:

a(1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

b. Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent.[3]

At the trial held on the reclamation complaint, Jefferson and the debtor submitted a stipulation of facts. After consideration of that stipulation and the briefs of the parties, we held, on March 28, 1980, that the debtor had failed to sustain its burden of proving that Jefferson's security interest was voidable under § 60 of the Act. In particular, we concluded that the debtor had failed to establish either that the debtor was insolvent at the time of the transfer in question[4] or that Jefferson knew or had

reasonable cause to believe that the debtor was insolvent at that time.[5] Accordingly, we entered an order granting Jefferson's complaint.

Thereafter, the creditors' committee filed a motion to intervene in this adversary proceeding and a motion for reconsideration of our decision of March 28, 1980. On June 5, 1980, we granted both of those motions.[6] Subsequently, several days of trial were held at which time Jefferson conceded that, for the purposes of the instant proceedings, the debtor was insolvent at the time of the transfer in question in March, 1979. Therefore, the evidence presented related solely to the issue of what Jefferson knew or should have known of the debtor's insolvency at that time. At the conclusion of the case presented by the creditors' committee, Jefferson made a motion for a directed verdict contending that the creditors' committee had failed to offer sufficient evidence to prove that Jefferson knew or had reasonable cause to know that the debtor was insolvent at the time of the transfer. We agree and will, therefore, grant Jefferson's motion.[7]

Among the arguments made by the creditors' committee was that the totality of the circumstances evidences that Jefferson knew that the debtor was insolvent in March, 1979. To support that contention, the creditors' committee points to the fact that Jefferson had lent the debtor $200,-000.00 in 1976 and 1977 and had never obtained any security for that loan until very shortly before the debtor filed its petition under the Act. However, Jefferson's vice president in charge of the debtor's account explained those circumstances by testifying, convincingly, that Jefferson had sought to get the principals of the debtor to

---

**3.** 11 U.S.C. § 96a and b (repealed 1978).

**4.** *See In re Devault Mfg. Co.*, Bankr. No. 79–620 ( Bankr. E.D.Pa. March 28, 1980), in which we held that the time of the transfer in question was March 22, 1980, when Jefferson perfected its security interest and that the debtor was insolvent as of that date.

**5.** *Id.*, slip op. at 8-10.

**6.** *See In re Devault Mfg. Co.*, 4 B.R. 382 (Bkrtcy.E.D.Pa.1980), *aff'd.* 14 Bankr. 536 (Bkrtcy.E.D.Pa.1981).

**7.** After the conclusion of the trial, the creditors' committee filed a motion for summary judgment. Because we find that Jefferson is entitled to a directed verdict, we will also deny the motion of the creditors' committee for summary judgment.

execute the security agreement since 1976 when the loan was made and the principals had, in fact, agreed to execute that agreement. He further stated that, despite Jefferson's continuous efforts to get the security agreement executed, the principals of the debtor did not sign it until March, 1979. As a result of that testimony, we conclude that Jefferson's ultimate acquisition of a security interest in certain of the debtor's property at a time when the debtor was insolvent does not, in and of itself, prove that Jefferson knew or should have known that the debtor was insolvent.[8]

The creditors' committee asserts, however, that there is sufficient additional evidence to support its contention that Jefferson knew or should have known of the debtor's insolvency. In particular, the creditors' committee pointed to evidence that Jefferson had evidence, in its files, of the debtor's insolvency. That evidence included proof that Jefferson possessed an audited financial statement for the year ending September, 1976, which showed that the debtor had an equity deficit of approximately $20,000.00. But, under cross-examination, Jefferson's vice president testified that he never looked at that statement until late 1978 and early 1979, but relied instead on a summary of the debtor's financial condition for the years 1973 to 1978, which summary purported to be compiled from audited financial statements as well as other sources. That summary showed that the debtor was solvent during the period in question. We conclude that Jefferson used reasonable business prudence in relying on the summary given to it by the debtor in 1978 and was not required to ignore that statement and rely only on the 1976 audited statement. We so conclude because, although the 1976 statement was an audited statement, that statement was over two years old when Jefferson obtained the security interest in the debtor's assets. Furthermore, it was reasonable for Jefferson to rely on the latter statement which accrued that it was based on audited financial statements as well as other sources because there was nothing to make Jefferson suspect the accuracy of the summary statement.

The creditors' committee argues, however, that there were indications, of which Jefferson was aware, that that summary statement was inaccurate. Among those indications was the fact that the summary statement showed that the debtor was solvent only by virtue of the fact that the debtor had included in the latest years' statements an ever-increasing item labeled "capitalized expenses." The debtor offered testimony that capitalizing expenses was not a recognized accounting practice. While we agree with the creditors' committee's contention that such an item gave rise to a duty to inquire on Jefferson's part, we conclude that Jefferson did fulfill that duty to inquire. Jefferson's vice president testified in this regard that he did inquire of the debtor as to the meaning of the capitalized expenses item and was told and believed that that item included expenses for the development of new products. Jefferson's vice president further testified that that explanation was satisfactory to him because the debtor had recently developed new products which resulted in an increase in its sales. We conclude from the above that Jefferson fulfilled its duty to inquire into the capitalized expenses item on the summary statement and that it acted reasonably in obtaining an answer to that inquiry and in relying on the information so obtained.

Another indication which the creditors' committee cites to support its contention that the summary statement was inaccurate was the fact that there were discrepancies between the summary statement and the 1976 audited statement. Notwithstanding those discrepancies,[9] we conclude that Jef-

---

8. *Cf. In re Cruff*, 280 F.Supp. 846 (W.D.Va. 1968), in which the district court held that the mere institution of garnishment proceedings by a creditor to collect a debt which had remained unpaid for several years did not, in the absence of other evidence, prove that the creditor knew or had reasonable cause to believe that the bankrupt/debtor was insolvent.

9. The discrepancies in those statements were

 

ferson acted reasonably in relying on the summary statement. While we believe that a creditor is required to compare meticulously all of the financial statements given to it by a debtor absent any circumstances which would cause the creditor to be suspicious of the accuracy of those statements, we find that there were no such circumstances in the instant case which would cause Jefferson, as a reasonable creditor, to be suspicious of the accuracy of the financial statements provided by the debtor.

However, the creditors' committee asserts that there were other circumstances that should have caused Jefferson to suspect the accuracy of the summary statement and investigate further. In particular, the creditors' committee points to the fact that in January, 1979, one of the debtor's trade creditors attached the bank account which the debtor maintained at the Jefferson Bank and collected $3,000.00 of a total of $30,000.00 allegedly due to the trade creditor by the debtor. However, Jefferson's vice president in charge of the debtor's account testified that that occurrence did not cause him to become overly concerned about the debtor's account because, he stated, it was not unusual for creditors of Jefferson's account-holders to attach their accounts. Nonetheless, he stated that he did inquire of the debtor as to the circumstances of the attachment and that he was told that the debtor disputed the debt allegedly due to the creditor but that it was not worth fighting the attachment for only $3,000.00. Given that explanation, and the other information available to him at that time, Jefferson's vice president testified that he had no reason to suspect the accuracy of the summary statement given by the debtor or to question the solvency of the debtor as stated in that statement. Jefferson's vice president stated that the other information of which Jefferson was aware and on which it relied at that time included (1) the fact that in 1977 another bank had approved a $400,000.00 line of credit for the debtor, (2) the fact that in December, 1978,

the debtor had borrowed $40,000.00 from Jefferson which was secured by a $132,-000.00 letter of credit and which was subsequently repaid by the debtor in the spring of 1979, and (3) the fact that the summary statement (and the answers to inquiries made by Jefferson about the capitalized expense item thereon) showed that the debtor's business was doing very well.

Based on all of the evidence presented herein, we conclude that the creditors' committee has failed to establish that Jefferson knew that the debtor was insolvent in March, 1979, or had reasonable cause to know that the debtor was insolvent at that time. Furthermore, we conclude that what duty Jefferson did have to inquire of the debtor's financial condition was fulfilled by it. We consequently conclude that Jefferson is entitled to a directed verdict and the motion of the creditors' committee for summary judgment be denied.

---

due to the fact that in the summary statement the debtor included a "capitalized expenses" category which resulted in a difference in the equity reported in the 1976 audited statement and the summary statement.