**In re N.R. GUARANTEED RETIREMENT, INC.,
Debtor.**

**N.R. GUARANTEED RETIREMENT, INC., Appellant,**

v.

**FIRSTMARK STANDARD LIFE INSUR-ANCE COMPANY and Superior Bank FSB, Appellees.**

**Nos. 90 C 2600, 89 B 10494.**

United States District Court,
N.D. Illinois, E.D.

Sept. 24, 1990.

Mark S. Lieberman, David A. Golin, Rosenthal and Schanfield, Chicago, Ill., for appellant.

Mitchell E. Jones, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for appellee Firstmark Standard Life Ins. Co.

Nathan H. Lichtenstein, James P. Arndt, Greenberg, Keele, Lunn & Aronberg, James T. Gardner, Timothy A. French, Neal, Gerber, Eisenberg & Lurie, Chicago, Ill., for appellee Superior Bank FSB.

### MEMORANDUM ORDER

BUA, District Judge.

Finding that the Chapter 11 petition in bankruptcy filed by debtor-appellant N.R. Guaranteed Retirement, Inc. ("N.R.") presented a classic case of the "new debtor syndrome," the bankruptcy court dismissed the petition for being filed without good faith.  112 B.R. 263.  N.R. now appeals the bankruptcy court's decision to this court. For the reasons stated herein, the judgment of the bankruptcy court is affirmed.

### FACTS

At the heart of the dispute between the parties to the underlying bankruptcy petition and this appeal is the real estate locat-

ed at 222 N. Michigan Avenue in downtown Chicago ("the property"). The property consists of 8,000 square feet of land improved with a 100–year–old, 5–story office and retail building. All of the relevant facts in this case revolve around the parties' respective interests in and relationship to the property. Those facts are summarized below.

*I.  Relevant Interests in the Property*

A.  Legal and Beneficial Ownership Interests

Since 1980, the property has been the res of a land trust ("the trust"), with legal title vested in the trustee, Harris Trust and Savings Bank. Since 1981, ownership of the beneficial interest in the trust has been transferred between a group of four corporations owned by Richard Fanslow. Those corporations are as follows: (1) Virick Limited ("Virick"), which is 100% owned by Fanslow; (2) Nurses Guaranteed Retirement Life Insurance Company ("Nurses"), which is 100% owned by Virick; (3) Life Assurance Company of Pennsylvania ("LACOP"), which is 99% owned by Nurses; and (4) N.R., which is 100% owned by Nurses.

LACOP held the beneficial interest in the trust until December 1983, when it transferred beneficial ownership to Nurses. Sometime later, Nurses transferred the beneficial interest to Virick, which then held beneficial ownership until June 9, 1989. On that date, Virick transferred the beneficial interest back to Nurses, and Nurses in turn transferred the interest to N.R.[1] Since N.R. was incorporated on June 5, 1989, N.R. had only been in existence for four days when it received the beneficial interest from Virick through Nurses. N.R. filed its Chapter 11 petition in bankruptcy on June 23, 1989, having held the beneficial interest in the trust for just two weeks.

B.  Security Interests

Appellees Firstmark Standard Life Assurance Company ("Firstmark") and Supe-

rior Bank FSB ("Superior") hold separate mortgages on the property. Both mortgages secure nonrecourse notes which were in default at the time of N.R.'s bankruptcy filing. The senior mortgage, held by Firstmark, secures a nonrecourse note which calls for repayment of $3.6 million. Over $4 million was owed on that note at the time N.R.'s bankruptcy petition was filed. The junior mortgage, held by Superior, secures a nonrecourse note in the amount of $7.1 million. At the time of N.R.'s bankruptcy filing, over $7 million was owed on the note held by Superior.

C.  Possessory Interest

In about November 1983, LACOP entered into an agreement to lease the property from the trust. Currently, under the amended terms of the lease, which runs through December 31, 1996, LACOP pays N.R. $100,000 per month in rent, plus all the expenses of operating the property. LACOP subleases part of its space, but the subtenants account for only a small percentage of LACOP's rent. Based on an appraiser's estimates, the bankruptcy court found that LACOP would receive $24,000 in rental income in 1989, and no more that $350,000 in annual rental income during the life of the lease.

D.  Contractual Interests Created By Netzky Sale/Leaseback

On December 28, 1984, Nurses, which at that time owned the beneficial interest in the trust, entered into a sale/leaseback arrangement with the Netzky Family Partnership ("Netzky"). The sale was executed pursuant to an "Installment Contract for Trustee's Deed." That contract, as amended, calls for Nurses to cause the trustee of the trust to convey title to the property to Netzky, subject to Firstmark's and Superior's mortgages and LACOP's lease, upon Netzky's payment of $10 million at the closing of the sale on January 2, 1994. The installment agreement obligates Netzky to

---

1.  The bankruptcy court opinion states that the transfers from Virick to Nurses and from Nurses to N.R. occurred on June 5, 1989, but this is

simply a misprint. The parties stipulated below that those transfers occurred on June 9, 1989.

make monthly payments to Nurses up to the date of closing. The payments total $110,333 per month, representing monthly interest payments in the amount of $95,833 and monthly contributions to operating expenses in the amount of $14,500. Pursuant to the leaseback agreement, as amended, Nurses, as lessee, is obligated to pay monthly rent to Netzky, as lessor, in the amount of $108,333. Thus, the installment sale and leaseback arrangement between Nurses and Netzky results in a net monthly payment by Netzky in the amount of $2,000. Since Nurses assigned its beneficial interest in the trust to N.R., N.R. is entitled to receive this net monthly payment from Netzky; N.R.'s interest in the property is subject to all the other terms of the Netzky sale/leaseback as well.

## II. N.R.'s Claim Against Intercounty Title Company

In a lawsuit filed in state court, N.R. claims that at the time the second mortgage was executed, Nurses deposited $3.8 million into an escrow account an Intercounty Title Company of Illinois ("Intercounty").[2] In return for this escrow deposit, N.R. claims, Intercounty agreed to: (1) make all mortgage payments as they came due on the first mortgage and (2) issue a title insurance policy to the second mortgagee in which the first mortgage would not be shown as a title exception. N.R.'s state court complaint alleges that Intercounty failed to make the payments on the first mortgage as required by the escrow agreement, and that Intercounty's breach of the escrow agreement caused the default of the first mortgage. The complaint seeks Intercounty's specific performance of the Nurses–Intercounty agreement.

## III. Foreclosure and Bankruptcy Proceedings Involving the Property

Prior to the filing of N.R.'s bankruptcy petition, Firstmark initiated an action to foreclose on the property, citing Virick's

default on the note secured by the property. Firstmark's foreclosure action, however, did not proceed very far. Firstmark filed its amended complaint for foreclosure on March 17, 1989, and Virick filed a motion to dismiss the foreclosure action shortly thereafter. Virick's motion to dismiss was denied on June 12, 1989. Eleven days later, the foreclosure proceedings were stayed by the filing of N.R.'s bankruptcy petition pursuant to 11 U.S.C. § 362.

On August 23, 1989, Firstmark filed a motion in the bankruptcy court seeking relief from the automatic stay or, alternatively, dismissal of N.R.'s bankruptcy petition. Sometime later, Superior filed a separate motion also seeking relief from the stay. Both Firstmark and Superior sought relief from the stay in order to proceed with foreclosure on the property. N.R. opposed Firstmark's and Superior's motions, and instead proposed a Chapter 11 reorganization plan under which the notes held by Firstmark and Superior would be paid back under terms more favorable to N.R., including lower interest rates and more distant maturity dates.

In connection with Firstmark's and Superior's motions, which the bankruptcy court consolidated, the parties entered into certain factual stipulations. The parties agreed that N.R. was formed in contemplation of filing a bankruptcy and that N.R. had virtually no other assets besides its interest in the property. The parties further stipulated that no act occurred between the date of N.R.'s incorporation on June 5, 1989, and the date of N.R.'s bankruptcy filing on June 23, 1989, which caused N.R. to file for bankruptcy. N.R. admitted that Virick transferred the property to N.R. because Virick "had assets other than those associated with the Property" and "[s]uch assets did not require the protection of chapter 11."

After conducting a hearing and examining the parties' arguments, the bankruptcy court issued an order dismissing N.R.'s bankruptcy petition. *In re N.R. Guaran-*

---

**2.** *See Harris Trust & Savings Bank, as Trustee under Trust No. 40704, and N.R. Guaranteed Retirement, Inc. v. Intercounty Title Insurance* *Co. of Illinois and Stewart Title Guaranty Co.,* No. 89 CH 5695 (Cir.Ct.Cook County, Ill.)

*teed Retirement, Inc.*, 112 B.R. 263, 279 (Bankr.N.D.Ill.1990). The court first determined that it had the authority to dismiss a Chapter 11 bankruptcy petition for being filed without good faith. The court then identified four separate grounds which courts have employed in finding that a bankruptcy petition should be dismissed for lacking good faith. One of the grounds—the "new debtor syndrome"—was described by the court as the following situation: lien-encumbered property is transferred by one entity to a second entity which has few, if any, other assets, and the transferee entity then files for bankruptcy within a relatively short period after receiving the property from the transferor. 112 B.R. at 273. The court ruled that once these characteristics of the new debtor syndrome are established, a presumption is automatically created in favor of granting relief to the property's lienholders under Sections 362(d) and 1112(b) of the Bankruptcy Code. *Id.* at 276, 278. To rebut that presumption, the court held, the debtor must prove both: (1) that the transferor of the property was itself in need of bankruptcy relief and (2) that the rights of lienholders were not adversely affected by the transferee's filing of the bankruptcy instead of the transferor. *Id.*

Applying this "new debtor syndrome" principle to the instant case, the court then held:

> Counsel for N.R. have acknowledged that this case bears all the hallmarks of the new debtor syndrome. As noted above, to demonstrate cause for relief under the "new debtor" decisions, creditors must establish that a transfer of the property securing their liens was made shortly before the bankruptcy was filed. That such a showing has been made here is conceded by N.R. To rebut the resulting presumption that relief is appropriate, N.R. must demonstrate (1) that the transferor of the property (Virick) was in need of bankruptcy relief and (2) that the secured creditors (Firstmark and Security [sic]) are not in a worse position because N.R. filed for Chapter 11 relief

> instead of Virick. N.R. has made neither showing.

*Id.* at 278.

In determining that N.R. had failed to rebut the presumption that relief under the new debtor syndrome was appropriate in the instant case, the bankruptcy court specifically noted that N.R. had produced no evidence of Virick's need for bankruptcy relief. In fact, N.R. had admitted that Virick owned assets which did not require bankruptcy protection. *Id.* The bankruptcy court also found that the rights of Firstmark and Superior had been adversely affected by Virick's transfer of the property to N.R. This determination was based largely on the court's valuation of the property at $9.75 million. The court calculated that given that value of the property, along with Firstmark's senior secured claim of $4 million, Superior's $7.1 million claim against N.R. was unsecured by at least $1.35 million. Therefore, the court noted, Superior would have an unsecured claim against N.R.'s bankruptcy estate in that amount pursuant to 11 U.S.C. § 506(a). The court then reasoned that the transfer of the property prejudiced Superior because "[as] a holder of an unsecured claim, Superior might well be in a better position with a bankruptcy filing by Virick [instead of N.R.], in light of Virick's potentially greater assets." *Id.*

Alternatively, the court held that even if N.R.'s reorganization plan provided for full payment of Superior's secured and unsecured claims, Firstmark and Superior would still be prejudiced by N.R.'s bankruptcy filing because, given the value of the property, "N.R.'s ability to consummate a 'full payment' plan is highly questionable." *Id.* As a result, the court concluded, relief to both Firstmark and Superior was appropriate under the principle of the new debtor syndrome.

## DISCUSSION

On appeal, N.R. does not take issue with the bankruptcy court's finding that a Chapter 11 bankruptcy petition may be dismissed for being filed without good faith under circumstances constituting the new

debtor syndrome.[3] N.R. also does not contest the bankruptcy court's finding that a rebuttable presumption for relief under the new debtor syndrome was created in the instant case by Virick's transfer of the 222 N. Michigan property to N.R. just two weeks before N.R.'s bankruptcy filing.[4] Instead, N.R. focuses its attack on the bankruptcy court's determination that N.R. failed to rebut that presumption.

As noted above, the bankruptcy court held that in order for N.R. to rebut the presumption that Firstmark and Superior were entitled to relief, N.R. had to satisfy two requirements. Specifically, the bankruptcy court required N.R. to establish: (1) that Virick was in need of bankruptcy relief and (2) that Firstmark and Superior were not adversely affected by Virick's transfer of the property to N.R. and N.R.'s subsequent bankruptcy filing. N.R. claims that the bankruptcy court erred in requiring N.R. to satisfy the first requirement because there is no basis under the law for imposing such a requirement. According to N.R., the bankruptcy court should have restricted its analysis to the second requirement—whether the rights of Firstmark and Superior were prejudiced by Virick's transfer of the property to N.R. N.R. further contends that in analyzing the second requirement, the bankruptcy court erred in finding that the rights of Firstmark and Superior had been prejudiced. N.R. maintains that there is no basis in the record for such a finding.

■ Since N.R. concedes that it had to show no prejudice to Firstmark and Superior in order to rebut the presumption that

relief under the new debtor syndrome was appropriate in this case, the primary issue in this appeal is whether the bankruptcy court properly concluded that N.R. failed to make such a showing. After all, if the bankruptcy court was correct on that score, then whether the bankruptcy court erred in requiring N.R. to make an *additional* showing in order to rebut the presumption—that Virick was in need of bankruptcy relief—becomes a moot point. Therefore, the initial question posed to this court is whether the rights of Firstmark and Superior were adversely affected by Virick's transfer of the property to N.R. shortly before N.R.'s bankruptcy filing. Since that question essentially involves a factual determination, this court must accept the bankruptcy court's finding on that point unless it is clearly erroneous. *In re Kimzey,* 761 F.2d 421, 423 (7th Cir.1985).

■ The court finds ample support in the record for the bankruptcy court's determination that Firstmark and Superior were prejudiced by the transfer of the beneficial interest in the trust to N.R. and N.R.'s subsequent bankruptcy filing. Without the transfer to N.R., Virick would have remained the beneficial owner. Virick, N.R. concedes, "had assets which did not require bankruptcy protection." As such, with Virick as the beneficial owner of the trust, the property would not have been subject to bankruptcy proceedings. Since the notes held by Firstmark and Superior were in default prior to the transfer to N.R., Firstmark and Superior could have foreclosed on the property and received virtually immediate satisfaction of their claims, with

---

3. Indeed, many courts have recognized that the new debtor syndrome is one form of bad faith which constitutes grounds for dismissing a Chapter 11 petition. *See, e.g., Carolin Corp. v. Miller,* 886 F.2d 693, 704–05 (4th Cir.1989); *In re Little Creek Development Co.,* 779 F.2d 1068, 1072–73 (5th Cir.1986); *In re Thirtieth Place,* 30 B.R. 503, 505 (Bankr.App. 9th Cir.1983); *In re Eighty South Lake, Inc.,* 63 B.R. 501, 507 (Bankr. C.D.Cal.1986), *aff'd,* 81 B.R. 580 (Bankr.App. 9th Cir.1987); *In re Yukon Enterprises, Inc.,* 39 B.R. 919, 921 (Bankr.C.D.Cal.1984); *In re Spenard Ventures, Inc.,* 18 B.R. 164, 166 (Bankr.D.Alaska 1982). Although the Seventh Circuit has not specifically addressed the issue of the new debtor syndrome, our appellate court has recognized

that a debtor's lack of good faith in filing a Chapter 11 petition constitutes grounds for dismissing the petition under 11 U.S.C. § 1112(b). *See In re Madison Hotel Associates,* 749 F.2d 410, 426 (7th Cir.1984).

4. The bankruptcy court based this ruling on the holding in *In re Yukon Enterprises,* 39 B.R. 919, 921–22 (Bankr.C.D.Cal.1984), wherein the court stated: "[O]nce the creditor establishes that the transfer of the distressed property to the debtor was in close proximity to the filing of the case, a prima facie showing of bad faith has been shown, thus creating a rebuttable presumption of bad faith."

minimal costs. The bankruptcy court determined that the property is worth at least $9–10 million. Accordingly, foreclosure would have satisfied Firstmark's claim in full and would have netted Superior no less than $5–6 million of its $7.1 million claim.

Instead, due to the transfer of the property to N.R. and N.R.'s subsequent bankruptcy filing, Superior and Firstmark were faced with several unfavorable circumstances. First, by virtue of the automatic stay and reorganization, any foreclosure action was precluded; Superior and Firstmark thus would be substantially delayed in recovering on their claims. Second, both Firstmark and Superior would incur legal fees and other costs associated with N.R.'s bankruptcy. These costs would likely be much greater than those associated with a simple foreclosure.

Third, under N.R.'s proposed reorganization plan, the terms of the debts owed to Firstmark and Superior would be unilaterally restructured in N.R.'s favor. N.R.'s plan provides that the principal due on the note held by Firstmark would become due in December 1994 instead of December 1991, and the interest rate payable on the note would decrease from 12% to approximately 9–10%.[5] The interest rate paid to Superior would receive a similar downward adjustment under N.R.'s plan.

N.R. maintained before the bankruptcy court—and seems to similarly argue on appeal—that the terms of its proposed plan do not prejudice Firstmark or Superior because the plan provides for payment of the present value of the "allowed secured claims" which those creditors hold. N.R. contends that Firstmark and Superior are entitled to no more than the present value of their allowed secured claim because the notes evidencing their claims are nonrecourse. This argument, however, totally ignores the express language of 11 U.S.C. § 1111(b). That provision gives special treatment to holders of nonrecourse claims where the value of the collateral is less than the amount of the debt. Under § 1111(b), an undersecured creditor's claim is allowed against the bankruptcy estate as if the creditor had recourse; the amount of the deficiency between the debt and the value of the security is treated as an unsecured claim. See In re National Real Estate Limited Partnership–II, 104 B.R. 968, 973–74 (Bankr.E.D.Wis.1989). Thus, even if N.R.'s plan did provide for payment of the present value of Firstmark's and Superior's allowed secured claims, such a plan would undercompensate Superior, since Superior's claim is partially undersecured. N.R.'s plan entirely disregards the portion of Superior's claim which is not secured, decreasing the amount rightfully payable to Superior under § 1111(b).

Finally, as the bankruptcy court aptly pointed out, N.R.'s bankruptcy filing adversely affects Firstmark and Superior in one important additional manner. Because N.R.'s ability to consummate a reorganization plan which provides for full payment of Firstmark's and Superiors's claims is highly questionable, N.R.'s bankruptcy filing has substantially increased the risk to both Firstmark and Superior of recovering on their claims. Full payment of Superior and Firstmark would require N.R. to make monthly interest payments and then pay off a principal debt of over $11 million. N.R.'s monthly income was established at $102,000–$100,000 per month in rent from LACOP and $2,000 per month from Netzky under the sale/leaseback agreement. As the bankruptcy court explained, even if N.R. is permitted to service the debts to Firstmark and Superior at a 10% interest rate, the interest payments due to Firstmark and Superior would consume virtually all of N.R.'s monthly income, and the majority of that income is from LACOP, whose incentive to default on its rental obligations is high since it loses money on the lease. 112 B.R. at 279 n. 10. Thus, the only source from which N.R. could satisfy the principal amounts owed to Firstmark and Superior is the money from the Netzky

5. The interest rate paid to Firstmark and Superior under N.R.'s proposed plan would be a rate equivalent to the yield on treasury bonds maturing January 1995, plus 1%. The bankruptcy court noted that this formula would have produced a rate of 9% at the time N.R. proposed its plan and 10% at the time the court dismissed N.R.'s bankruptcy petition.

sale—$10 million. That amount would not cover the principal owed to Firstmark and Superior.

N.R. claims that the principal amounts owed to Firstmark and Superior could be satisfied by money from other sources, such as capital contributions by Nurses or recovery from Intercounty in its state court lawsuit. Those sources, however, do not serve to reduce the risk to Firstmark and Superior. As the bankruptcy court recognized, "[n]o evidence was submitted the would allow the court to determine the likely outcome of the title company litigation or otherwise place a value on this litigation as an asset of N.R." 112 B.R. at 268. As a result, any recovery from Intercounty is entirely speculative; likewise, Nurses' desire to infuse capital into N.R. is completely unknown and cannot be assumed. Thus, Firstmark and Superior cannot count on N.R.'s "other sources" to receive payment of their debts under a reorganization plan by N.R.

N.R. also argues that the bankruptcy court's conclusions as to the value of the property were incorrect. N.R. maintains that if the bankruptcy court had properly determined the value (at a higher amount), it would not have found that Firstmark and Superior had been prejudiced by N.R.'s bankruptcy filing. However, the only testimony before the bankruptcy court concerning the value of the property came from N.R.'s expert, Eugene Stunard. Without discussing all of the details of that testimony, this court simply notes that the bankruptcy court astutely pointed out that Stunard's analysis of the value of the property failed to consider some critical factors. For instance, Stunard failed to factor into his analysis the likelihood that LACOP would default on its rental payments, which represent N.R.'s only significant source of income. Stunard also failed to take into account the effect of the Netzky sale/leaseback in capping the future value of the property. Given these patent deficiencies in Stunard's analysis, the bankruptcy court properly refused to blindly accept Stunard's testimony regarding the value of the property. More importantly, since Stunard's testimony did not defini-

tively establish the value of the property, N.R. cannot now argue that the value of the property was sufficiently high to preclude any prejudice to Firstmark and Superior from N.R.'s bankruptcy filing. As this court has already noted, N.R. has not contested that it had the burden of showing that Firstmark and Superior were not prejudiced by N.R.'s bankruptcy filing. Stunard's testimony regarding the value of the property is simply insufficient to meet that burden.

In one final argument in support of its position that Firstmark and Superior were not adversely affected by N.R.'s bankruptcy filing, N.R. likens this case to two other bankruptcy cases where the courts held that creditors were not prejudiced by a bankruptcy filing despite the presence of circumstances constituting the new debtor syndrome. However, each of those cases— *In re Beach Club*, 22 B.R. 597 (Bankr.N.D. Cal.1982), and *In the Matter of Levinsky*, 23 B.R. 210, 218 (Bankr.E.D.N.Y.1982)— are readily distinguishable from the instant case. In *Beach Club*, the court held that creditors were not prejudiced by the transfer of property to a "new debtor" on the eve of the new debtor's bankruptcy filing because (1) there was a large equity cushion in the property, (2) the transferor was a general partner of the debtor-transferee, making the transferor liable to the creditors both before and after the transfer, and (3) the creation of the new debtor was done for a good business purpose. 22 B.R. at 599. None of those circumstances are present here. Similarly, in *Levinsky*, the court found that the creditors were not prejudiced because the transferors became general partners of the newly formed transferee, thus remaining accountable to creditors both before and after the transfer. 23 B.R. at 218–19. The *Levinsky* court expressly distinguished another case in which new debtor circumstances were found prejudicial to creditors by pointing out that in that case, unlike in *Levinsky*, the transferor did not qualify for Chapter 11 protection. Since the transferor in the instant case also does not qualify for Chap-

ter 11 protection, the *Levinsky* decision is clearly inapposite to the instant case.

In sum, N.R. has failed to establish any basis in fact or law to support its argument that Firstmark and Superior were not prejudiced by Virick's transfer of the property to N.R. and N.R.'s subsequent bankruptcy filing. As a result, this court cannot conclude that the bankruptcy court erred in finding that Firstmark and Superior were prejudiced. Furthermore, because it is clear that the bankruptcy court did not err on that ground, this court need not examine whether the bankruptcy court erred in imposing an additional requirement on N.R. to rebut the presumption that relief to Firstmark and Superior was appropriate in this case. In light of N.R.'s failure to satisfy the requirement that Firstmark and Superior not be prejudiced—a requirement which N.R. concedes was properly imposed—any error in imposing an additional requirement on N.R. was harmless.

## CONCLUSION

For the foregoing reasons, the decision of the bankruptcy court is AFFIRMED.

IT IS SO ORDERED.