In re DOWNTOWN PROPERTIES, INC., Debtor.

Bankruptcy No. 93–42753–3–11.

United States Bankruptcy Court, W.D. Missouri.

Nov. 30, 1993.

245

Michael Berman, Berman & Singer, P.A., Kansas City, MO, for debtor.

Michael Flanagan, Polsinelli, White, Vardeman & Shalton, P.C., Kansas City, MO, for North American Sav.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

This is a Chapter 11 case. Debtor owns real estate which consists primarily of a multi-level parking garage and adjacent shop and office space, in downtown Kansas City, Missouri. North American Savings Bank, F.S.B., ("North American") which holds a lien on such real estate, has moved to dismiss the case, or in the alternative, for relief from the automatic stay. Movant's foreclosure sale had been scheduled for the day on which this Chapter 11 case was filed. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334. I find that the motion to dismiss should be granted.

Downtown Properties, Inc. ("DPI") is a Missouri corporation. In addition to the parking garage and adjacent commercial property, DPI owns a condominium in the Kansas City area. The stock of DPI is owned by the Cathleen Clark Trust ("Trust"). The Trust's grantor is now known as Cathleen Clark Barket. The beneficiaries of such Trust are the children and grandchil-

dren of the grantor. Other than the stock in the debtor, the Trust's only asset is a promissory note in the amount of approximately $44,000, as to which the Trust receives monthly payments of $1,169. DPI is run by Douglas Axon, a certified public accountant who also serves as trustee of the Trust. Axon's fee for managing DPI is four percent of its rental income, payable monthly. He is paid a separate fee for his services as the trustee. He is also compensated for his accounting services to DPI and the Trust. Other than Mr. Axon, DPI has one employee, a maintenance person for the commercial property.

The grantor of the Trust resides, rent-free, in the condominium owned by. DPI.[1] The Trust makes the mortgage payment on this condominium. Neither the Trust, its grantor, nor its beneficiaries, are both willing and able to provide any capital to DPI to fund its Plan of Reorganization.

Debtor acquired the downtown real estate on or about October 30, 1981. At that time, and since, the property has been subject to a promissory note and deed of trust now held by North American. The balance on such note is approximately $1,345,146.77.

Subsequent to DPI's acquisition the downtown property deteriorated, due in large measure to debtor's having inadequate capital with which to maintain the property. In particular, the parking garage, which has 600 spaces and produces more rent than the other tenants combined, was in need of significant repairs. Accordingly, debtor and Allright Carpark, Inc. ("Allright") entered into an agreement by which Allright would continue to occupy the garage as it had in the past, and would front the money to make the repairs. The obligations of the parties are contained in a document entitled "Lease Agreement", which is dated August 11, 1989. Debtor's interpretation of that agreement is central to this Chapter 11 case.

Other than the parking garage, the downtown real estate consists of approximately 23,482 square feet of commercial space. Previously, one tenant occupied approximately

1. The condominium has a scheduled value of $80,000, and a scheduled mortgage debt of $69,- 153.09. The monthly payment is approximately $550.

12,397 square feet. When that tenant's lease expired in March 1992, it chose not to renew. Only 2,346 square feet of that space has been leased, to a local bank. The debtor has been negotiating for approximately one year with such bank to take the remaining 9,689 sq. ft. of the vacated space, but no lease has been signed. In addition, three smaller spaces, totalling 3,176 square feet, are vacant.

Under its current debt structure, debtor would be operating at a loss of approximately $8,163.99 per month if it were servicing its secured debt in full and paying its monthly share of real estate taxes.[2]

North American has moved to dismiss these proceedings. Section 1112(b) of the Bankruptcy Code ("Code") provides in part as follows:

> (b) [O]n request of a party in interest or the United States Trustee, and after notice and a hearing, the court may convert a case under this chapter to a case under Chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—
>
> > (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

11 U.S.C. § 1112(b).

The debtor currently operates at a deficit on a monthly basis because of its inability to fund the real estate tax escrow. In addition, the debtor is not fully servicing its debt due North American.[3] For these reasons, there is a continuing loss to or diminution of the estate. The remaining issue is whether there is a reasonable likelihood of rehabilitation.

■ Debtor contends that it will be able to alter three components of its financial picture, and thereby become a viable business. First, debtor contends that it intends to pro-

pose a Plan which lowers the interest rate payable to North American from the current ten percent to eight percent, despite the fact that North American is an oversecured creditor.[4] On the current balance, such reduction would result in a monthly savings of approximately $2,241.91. Of course, even if confirmable, that in and of itself is not enough to make up the monthly deficiency.

The second factor cited by the debtor is its intent to lease the vacant space of 9,689 square feet. Debtor contends that in the near future it will enter into an agreement to lease such space for approximately $6.00 per square foot, resulting in increased rental income of $5,000 per month. The one prospective tenant mentioned is the local bank which has leased other space in the property. Negotiations with such bank have taken place on and off for approximately one year. In fact, North American had agreed to call off its foreclosure sale if an acceptable lease was signed. With no lease, debtor filed this Chapter 11 proceeding to stop such foreclosure. At the hearing, no evidence of any firm commitment from such bank was offered. I find that debtor has not demonstrated a reasonable likelihood of entering into such lease in the foreseeable future and, in any event, such lease would not in and of itself solve the debtor's monthly shortfall.

The final component of DPI's projected Plan relates to Allright. Some additional background of the relationship between DPI and Allright is needed here. Prior to the time the lease was executed, it was estimated that the repairs needed for the parking garage would cost approximately $1.2 million. Debtor was unable to fund the cost of such improvements and repairs. Therefore, the parties agreed that the repairs and tenant improvements would be made by Allright. Allright did make such repairs and improvements and expended approximately $1.2 mil-

---

2. The operating statement filed pursuant to Local Rule 1.016(B) projects a monthly surplus of $4,049.16. Such statement does not, however, include a monthly payment of $6,013.15 owed to North American or a real estate tax escrow of $6,200 per month.

3. Under the approved cash collateral order, Allright's monthly rent of $9,212.85 is paid directly

to North American. The remaining $6,013.15 is not being paid at this time.

4. An appraisal obtained by debtor shows that the property has a value of $1.4 million with the Allright agreement in place, and a value of $2.3 million if the Allright agreement were voided.

lion. A lease between the parties acknowledged that the real estate was in need of substantial repairs as of the date of execution of the lease, that Allright would pay for such work, and that all additions, alterations, and changes to the leasehold made by Allright would become a part of the real estate owned by debtor. The parties further agreed that as consideration for the tenant improvements to be made by Allright, a portion of the rent due from Allright to debtor would be abated. Thus, while the lease calls for base rent of $20,833.33 per month, Allright is obligated to pay debtor $9,212.85 at this time.[5] Under the terms of the Lease Agreement, in the event of default by Allright, debtor has the right to dispossess Allright, and Allright has no further rights in the real estate, including no right to recoup any of the funds expended. Furthermore, the lease contains no payment obligations governing any payments to be made by debtor to Allright. In fact, there is no writing evidencing any payment obligation of any sort of debtor to Allright. Instead, debtor has the option to repay the amount spent by Allright for repairs and improvements, in which case Allright would pay the base rent thereafter without abatement. Debtor paid nothing for such option.

■ Despite all the above, debtor contends that the lease is not one, but two separable transactions. The first transaction would be a lease with rental payments due debtor in the amount of $20,833.33 per month. The second transaction is allegedly an unsecured "loan" by Allright to DPI in an amount in excess of $1.2 million, with DPI obligated to repay such "loan" at $12,197.72 per month. DPI assumes that such "loan" payment is amortized over twenty-five (25) years at an interest rate of 11.5%. Thus, in order to reorganize its finances, the debtor intends to "assume" what it alleges is the "lease transaction", and to require Allright to make rent payments to DPI in the amount of $20,833.33 per month.

At the same time, the debtor intends to restructure the "loan" by making payments to Allright on a monthly basis in less than the amount of the rent which Allright is entitled to abate pursuant to the lease. In this fashion debtor intends to reorganize its finances and put itself on a stable footing.

■ Debtor's motivation in attempting to divide the Lease Agreement into two separate transaction is obvious [6]. A debtor which assumes a lease or executory contract cannot choose to accept the benefits of the contract and reject its burdens; it must either assume the agreement in full or reject. *Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir.1985); *In re New York Trap Rock Corp.*, 137 B.R. 568, 574 (Bankr. S.D.N.Y.1992). Thus, if the Lease Agreement is indivisible, DPI may not pick and choose among the terms of such agreement and selectively accept portions without assuming all, including the rent abatement terms.

■ In determining whether the lease constitutes one agreement, or is divisible, both the Bankruptcy Code and Missouri law look to the intent of the parties. *In re Cafe Partners/Washington 1983*, 90 B.R. 1 (Bankr. D.D.C.1988); *In re Giesing*, 96 B.R. 229, 231 (Bankr.W.D.Mo.1989) (Koger, C.J.) *Rexite Casting Co. v. Midwest Mower Corp.*, 267 S.W.2d 327 (Mo.Ct.App.1954). Here, there is no reasonable dispute that the parties intended the lease to be one indivisible agreement. The language of the agreement shows that the parties intended a long-term, landlord-tenant relationship under which Allright would pay reduced rent to debtor and Allright would make certain repairs and improvements which would become part of the leased property. The amount of rent to be

---

**5.** Pursuant to the Agreement, rent payments were to be as follows:

Between August 16, 1989 and February 14, 1990, rent was in the amount of $20,833.33 per month; between February 15, 1990 and August 14, 1996, rent was in the amount of $8,591.97. Pursuant to a Third Amendment to Lease Agreement dated August 21, 1991, the amount of monthly rent due and payable to debtor was increased because the cost of repairs was less than had been anticipated.

**6.** I note in passing that use of the bankruptcy process solely to reject an unprofitable contract has been found to constitute grounds for dismissal. *In re Dixie Broadcasting, Inc.*, 871 F.2d 1023 (11th Cir.1989), citing *In re Waldron*, 785 F.2d 936 (11th Cir.1986).

paid, the due date, and other rent provisions are set forth in detail, and all payments are characterized as rent. There is no language anywhere in the Lease Agreement which refers in any way to a loan. No note was signed by debtor in favor of Allright, and no collateral was given to Allright to secure such "loan". While DPI has the option of paying Allright the amount spent on repairs, thereby causing the lease payments to increase, DPI is in no way obligated to do so, or to make any other payment to Allright. And, if Allright defaults, in paying rent or otherwise, DPI can evict Allright and rent to a new tenant without making any payment to Allright for the repairs and improvements which Allright provided pursuant to the Lease Agreement.

Furthermore, the conduct of the parties since the lease was signed evidences their intent to treat their obligations as part of one interdependent agreement. At all times prior to the bankruptcy, both debtor and Allright posted the transaction on their corporate books as a lease. Each year, Allright has reported all monies paid to DPI as rental payments under a lease on its 1099 tax forms. According to Mr. Axon, at the time the transaction was entered into he "considered" treating the relationship between the parties as both a lease and a loan, but declined to do so until the bankruptcy was filed some four years later. Only then did he change his practice and begin to treat the abated rent as a loan repayment on the DPI books. However, based on the testimony of Allright's expert witness, generally accepted accounting principles require that this transaction be booked solely as a lease, not part lease, part loan. There is no reasonable basis for the debtor to claim otherwise.

As a result of the above, the debtor is unable to use this Chapter 11 proceeding to restructure its finances and propose a feasible Chapter 11 plan.[7] Since there is an absence of a reasonable likelihood of rehabilitation, as well as continuing loss to or diminution of the estate, the Motion to Dismiss should be sustained.

In addition, I find that independent "cause" exists to dismiss this case. Recall that Section 1112(b) allows dismissal "for cause, including" various enumerated factors. 11 U.S.C. § 1112(b). The enumerated factors are not exclusive. 11 U.S.C. § 102(3); In re N.R. Guaranteed Retirement, Inc., 119 B.R. 149 (N.D.Ill.1990); In re Harvey Road Associates VIII, 140 B.R. 302 (Bankr. D.Mass.1992). Certainly cause exists if no good purpose is to be served by the case. The only way to determine such purpose is to look to what the debtor hopes to gain for itself, its creditors, and/or its employees in a confirmed plan. Here, North American contends that the only person who stands to benefit from the case is Mr. Axon, who will continue to receive his four percent monthly fee for managing DPI. As president and sole director of debtor, Mr. Axon made the decision to file the case. Of course, preservation of fees for a professional is not a proper purpose for a Chapter 11 case.

Debtor responds that if it can reduce the interest paid North American, rent the vacant space, and recast the Allright relationship, it would be able not only to repay its debts but eventually to have something left for the beneficiaries of the Trust which owns debtor. Therefore, debtor claims a legitimate purpose for the bankruptcy. I disagree. The Trust grantor's apparent desire to provide for her children and grandchildren is commendable. However, their faint hope of ever receiving anything from this property is dependent upon their request that this Court ignore the express terms of the agreement between the debtor and Allright. The Chapter 11 process is properly used to restructure obligations, not to rewrite history.

7. Even if the debtor could propose a feasible plan, such plan would not be confirmable if opposed by North American and Allright. Supposing debtor could create a $1.2 million loan obligation to Allright out of the existing lease, that obligation would be an unsecured claim. Other than the "claim" debtor contends is due Allright, debtor's schedules show unsecured claims of $29,038.63, due primarily to utilities.

The "claim" allegedly due Allright would need to be placed in the same class as the other unsecured debts. See, In re Lumber Exchange Building Limited Partnership, 968 F.2d 647 (8th Cir. 1992). Therefore, Allright could block acceptance by the unsecured class, 11 U.S.C. § 1126(c), and along with North American could effectively block confirmation. 11 U.S.C. § 1129(a)(10) and (b)(2)(B).

Since no legitimate purpose is served by this case, cause exists to dismiss.

An Order consistent with this Memorandum Opinion will be entered this date.