**In re SCHMITT FARM PARTNERSHIP,
Debtor–Appellant.**

Nos. 93 C 5885, 93 B 12008.

United States District Court,
N.D. Illinois, E.D.

Nov. 15, 1993.

George M. Hoffman, Lawrence M. Benjamin, Chicago, IL, for USAA Real Estate.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Debtor Schmitt Farm Partnership ("Schmitt Farm") has appealed the August 12, 1993 order of Bankruptcy Judge Thomas James, in which he granted the motion of mortgagee USAA Real Estate Company ("USAA") to lift the automatic stay imposed by Bankruptcy Code § 362, 11 U.S.C. § 362.[1] That order, if upheld, will permit USAA to proceed with its state court foreclosure proceedings against Schmitt Farm's sole asset— a 150–acre tract of vacant real estate in Aurora, Illinois (the "Property").

Briefing on the appeal has been completed, and this Court has read through the entire record comprising:

1. both sides' written submissions filed before Judge James;

2. the Real Estate Sale Contract ("Contract") between "Noddle Development Company ["Noddle"] or Nominee" as designated purchaser and Merchants National Bank of Aurora, Trust No. 4481 ("Land Trust 4481") as designated seller relating to the Property;[2]

3. 177 pages of transcript (cited "Tr.—") of the August 12 hearing before Judge James; and

4. Judge James' one-paragraph minute order of that same date, granting USAA's motion "[f]or the reasons stated in open court...."

For the reasons stated in this memorandum opinion and order, Judge James' order lifting the stay is affirmed.

### Facts [3]

Until a few months before Schmitt Farm sought to wrap itself in the mantle of Chap-

Bruce M. Friedman, Joel A. Stein, Chicago, IL, for Schmitt Farm Partnership.

---

1. All further citations to the Bankruptcy Code will take the form "Code § —," referring to the numbering in Title 11.

2. Ex. 1 to this opinion is a photocopy of the entire Contract, though Schmitt Farm had tendered an unintentionally incomplete version as part of its Appendix supporting its initial brief. More on this subject later.

3. This section sets out a summary of the record before Judge James. As the later discussion reflects, the issues between the parties relate not to those facts as such, but rather to the inferences and conclusions to be drawn from them.

ter 11, both the Property (which lies north of Indian Trail Road on the east and west sides of Orchard Road in Aurora) and some 350 acres to the south of Indian Trail Road (the "South Acreage") were equitably owned by Orchard Valley Partnership ("Orchard Valley"). Originally USAA had owned both parcels and had sold them to Primus West Corporation ("Primus") in December 1989 (Primus placed title in a different land trust with Merchants National Bank, its Land Trust 4251) for about $2.4 million in cash and about $9.7 million represented by a nonrecourse purchase money mortgage having a one-year maturity.

Primus assigned the beneficial interest in Land Trust 4251 to Orchard Valley Partnership, a partnership among Primus (which had a 37.5% interest), Dearborn Investments Limited Partnership ("Dearborn Limited," which had a 57.5% interest) and Crislar Enterprises, Inc. ("Crislar," which had a 5% interest).[4] In December 1990 another $2.6 million was paid to USAA, and at that time the relationship among the parties took a different form:

> 1. USAA released its mortgage on the South Acreage (thus facilitating the separate development of that parcel, for which purpose Orchard Valley obtained a development loan from Continental Bank, which took a first mortgage on the South Acreage).
>
> 2. USAA's remaining mortgage of some $7.1 million (now encumbering only the Property) was extended for one year to December 1991.

Instead of Land Trust 4251 remaining in title to both parcels, new Land Trust 4481 took title to the Property (subject, of course, not only to USAA's mortgage but also to its right to approve or disapprove any assignments of beneficial interest in that land trust[5]).

When USAA's mortgage remained unpaid at maturity, the parties engaged in post-default negotiations for the possible further restructuring of the debt. Those negotiations collapsed in March 1992, and on April 13 of that year USAA filed a state court action to foreclose on the Property and collect its indebtedness. Orchard Valley and other defendants delayed that action for nearly a year by filing groundless counterclaims asserting that USAA had breached a draft letter agreement (one never signed by USAA) looking to the possible restructuring of the indebtedness.

In March 1993 the state court granted partial summary judgment in favor of USAA, finding (1) that USAA was entitled to judgment as to liability on its Complaint and (2) that defendants' counterclaims raised no genuine issues to preclude such a judgment. That left open for determination only the amount due under the USAA note and mortgage, a subject that was set for trial before the state court on June 4, 1993.

Meanwhile, in March 1993 (either shortly before or after the entry of summary judgment in the state court) Orchard Valley executed an assignment of its beneficial interest in the Property to Schmitt Farm. That assignment was not consented to by USAA, so that it never took effect in the records of the Trustee under Land Trust 4451. As with the other entities already referred to, Schmitt Farm had no other assets and no employees—its only function was to hold the beneficial interest in the Property, and it had no expected source of income other than from a potential sale of the Property.

Originally the partners and their percentage interests in Schmitt Farm were identical to those already reflected in this opinion as to Orchard Valley. Then just one day before the June 4 trial date in the state court fore-

---

4. Like Schmitt Farm, all of those entities were single-asset entities (owning either vacant land or interests in the other entities whose sole asset was vacant land). None had any employees.

5. Typically real estate mortgages—at least on nonresidential properties—include acceleration clauses if the property is conveyed (after all, even in nonrecourse situations the mortgagee has an interest in the identity of the owner, whose deal-

ings with the property may of course affect the mortgagee's security). Where land trusts are involved, a mortgagee invariably also includes a veto power or other control over any assignment of the beneficial interest, to close the loophole under which the property could effectively be sold or transferred via such an assignment without the need to convey record title and thus trigger the acceleration clause.

closure proceeding, those interests were reorganized: Primus and Dearborn Limited traded their interests, so that Primus then owned 95% of Orchard Valley and Dearborn Limited owned 95% of Schmitt Farm. Crislar assigned the other 5% interest in Schmitt Farm to Dearborn Investments, Inc. ("Dearborn Inc.," the general partner of Dearborn Limited and another single-asset entity).

Less than two hours before the June 4 state court trial, Schmitt Farm filed its Chapter 11 bankruptcy petition. Nearly two months after that Chapter 11 filing—and just two weeks before the August 12 evidentiary hearing before the Bankruptcy Judge—James Avgeris ("Avgeris") as the purported agent for Land Trust 4481 entered into the Contract with Noddle.

After the August 12, 1993 evidentiary hearing, during which Judge James heard testimony from Primus' sole shareholder and President Richard Faltz ("Faltz") and Dearborn Inc.'s President Avgeris, followed by counsel's oral argument, Judge James concluded that "neither the Bankruptcy Courts nor the creditors in this case should be subjected to the costs and delays of a bankruptcy proceeding under the conditions that [have] been brought to the Court's attention" (Tr. 171). Judge James found that Schmitt Farm's filing lacked good faith, and he lifted Code § 362's automatic stay to allow USAA to continue with the state foreclosure action.

### Schmitt Farm's Lack of Good Faith

Judge James' determination that Schmitt Farm's filing lacked the requisite good faith poses a substantial hurdle for the debtor. As *In re Love,* 957 F.2d 1350, 1354 (7th Cir. 1992) (citations omitted) teaches:

> The bankruptcy court's good faith finding is a purely factual finding evaluated under the clearly erroneous standard of review. The clearly erroneous standard requires this court to give great deference to the bankruptcy court, the trier of fact. Under this standard, if the trial court's account of the evidence is plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced that it would have weighed the evidence differently as trier of fact. Indeed, rever-

sal under the clearly erroneous standard is only warranted if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Schmitt Farm attempts to dilute (or to avoid entirely) the force of that principle by repeatedly emphasizing that Avgeris' testimony was assertedly unrebutted. But that contention of course glosses over—or more accurately ignores entirely—the basic proposition that the trier of fact is empowered to determine both the *credibility* and the *weight* of the testimony and other evidence. No "unrebutted" but noncredible testimony needs to be given *any* weight by the factfinder.

Twice this past week this Court has instructed juries—one civil, one criminal—by repeating the familiar instructions as to all of the factors to be taken into account in determining both the witnesses' credibility and the weight (if any) to be ascribed to their testimony, and by adding the following equally familiar instruction:

> You should consider this evidence in the light of your own observations and experiences in life.

If a lay juror is thus entitled to bring his or her common sense and life experience through the courtroom door to aid in evaluating evidence, it would be bizarre indeed to give less credence to the common sense and knowledge of an experienced bankruptcy judge. Nor is this Court required to divorce itself from its own background in reviewing Judge James' findings.

It was certainly well within Judge James' competence to determine that what was at work on the part of Schmitt Farm and its predecessor entity was really a further effort at delay—additional obstructionist tactics pursued in the Micawber-like hope that "something will turn up." In the fall of 1992 the Orchard Valley partners had discussed the possibility of filing in bankruptcy, a filing that would have provided USAA with materially greater security than the current pro-

ceeding.[6] But Faltz (then Orchard Valley's managing partner) viewed that prospect as "personally abhorrent" and believed that any bankruptcy filing would hurt his reputation in the marketplace (Tr. 27–28, 45, 75). By contrast, such a filing posed no problems for Avgeris.

Immediately before the Chapter 11 filing the partners restructured their arrangements to readjust their shares in the South Acreage (which was residential in character) and the Property (which was commercial in nature). Avgeris attributed that restructuring to Faltz' and Avgeris' preferences and to Avgeris' own greater experience in developing commercial properties, but even so it can scarcely be viewed as lacking in significance that:

1. Dividing up the parcels by breaking the pre-existing partnership arrangements put Avgeris into a position to invoke bankruptcy (as he preferred), while at the same time sparing Faltz the step that *he* found unpalatable.

2. Faltz had been the developer of the "auto mall" idea that was hoped to be an important component of the commercial use of the Property—and if that idea were to bear fruit, Faltz would be entitled to a commission (thus retaining a material interest, albeit not the same ownership interest, in the Property even after the transfers).

3. Faltz was substantially experienced in commercial brokerage and development, and Orchard Valley (of which it will be recalled Faltz was managing partner) was well qualified to develop the Property commercially.

It is no accident, given Faltz' aversion to any bankruptcy filing, that Orchard Valley did not in fact call Chapter 11 to its aid after the split. Although Orchard Valley was indeed in default of its obligations (and although Schmitt Farm seeks to emphasize that Orchard Valley was thus insolvent in one of the senses of that term relevant for bankruptcy purposes), it clearly had a very substantial equity (a multimillion dollar one) in the South Acreage. That equity enabled Orchard Valley to work out its problems without having to go down the tubes. Bankruptcy Judge James was entitled to look askance at the very different manner in which Orchard Valley ultimately sought to treat USAA from the treatment that it gave its other creditors (see Tr. 170).

■ As suggested a bit earlier, Schmitt Farm's lack of good faith is underscored by an obvious factor that, though not heavily relied on by Judge James, this Court is entitled to consider in applying the clearly erroneous standard to his decision (*Love*, 957 F.2d at 1362). Orchard Valley was more than healthy in the net worth sense (the other relevant standard of a debtor's solvency or insolvency):

1. In the fall of 1992 the South Acreage was appraised at about $9.9 million, encumbered by mortgages of less than one-third that amount.

2. Orchard Valley also owned unencumbered promissory notes aggregating some $450,000.

Even though USAA was in a nonrecourse position *outside* of bankruptcy, Section 1111(b) and bankruptcy case law applying that provision would give USAA a claim (to the extent that it would prove to be undersecured as against the Property alone) that could provide it with the same benefits as the owner of a recourse indebtedness (*In re N.R. Guaranteed Retirement, Inc.*, 112 B.R. 263 (Bankr.N.D.Ill.1990), *aff'd*, 119 B.R. 149, 154 (N.D.Ill.1990)).[7]

Hence the Orchard Valley split-up of the two parcels enabled it (through the new entity, Schmitt Farm) to place USAA at major risk, while at the same time Orchard Valley insulated its other valuable assets—the high-equity South Acreage and the promissory notes—from sharing in that risk. Were it not for that split-up, the Property could not have been put under the protection of the Bankruptcy Court, thus blocking USAA's

---

**6.** More of this later too.

**7.** Schmitt Farm's Reply Brief studiously avoids mentioning that aspect of USAA's argument, nor does it offer up any authority to question USAA's contention in that respect.

proposed foreclosure, without also subjecting the South Acreage and the promissory notes to a possible USAA claim if the value of the Property did not satisfy the entire debt owed to it. As the later discussion reflects, such a course of conduct has frequently been viewed by the courts as an indicium of bad faith. And that remains true even if it is not treated as an independent ground under the rubric of the "new debtor syndrome" referred to later in this opinion.

What did Schmitt Farm and Avgeris have in June 1993 when—already having brought more than a year's delay in the foreclosure action by repeated delays without their having developed any viable future for the Property—they made their last-second-Chapter 11 filing to stave off entry of a foreclosure decree? Nothing: no business, no employees, no source of income, no source of fresh capital—only a single asset in substantial default with no identifiable prospects. Then when 60 days later they did produce an asserted prospect, it fell far short of what Judge James was required to credit as evidencing good faith to support the original filing: That asserted prospect was evidenced only by the Contract, which Judge James had every right to view as a combination of smoke and mirrors.

Although it helps to have substantial experience in major real estate transactions to see all of the obvious shortcomings in the Contract, no such degree of sophistication in the area is necessary to tick off enough to justify Judge James' "pie in the sky" characterization of that last-ditch submission:

1. For a stated $11 million sale transaction, $10,000 in earnest money is frankly ludicrous—less than 0.1%. Even if the additional $90,000 recited to be paid in 120 days were to bring the earnest money to a bit less than 1% of the sale price, that is not at all representative of substantial bona fide real estate transactions.

2. That comparatively small amount of earnest money is linked closely to the essentially one-way nature of the Contract—the thing that leads USAA's counsel to label it accurately as an "option" in their current brief. Although the front of the printed Contract form reads as though the purchase and sale were unconditional, the conditions on the reverse side present a totally different picture.[8] Here is what Condition 5 says (with deletions from the printed form indicated by a dashed line through the language, and with typed insertions indicated by underlining):

> If within 120 days from the date hereof this contract is terminated without Purchaser's fault, and upon notice to Seller the earnest money shall be returned to the Purchaser but if the termination is caused by the Purchaser's fault, then ~~at the option of the Seller and upon notice to the Purchaser~~, the earnest money shall as Seller's sole and exclusive remedy be forfeited to the Seller and applied first to the payment of Seller's expenses and then to payment of broker's commission; the balance, if any, to be retained by the Seller as liquidated damages.

That is truly the language of an option: Noddle is free to default and walk away from the deal, and only the earnest money ($10,000 or $100,000, depending on when it walks away) is forfeited.

3. Relatedly, the Contract's listing of the purchaser as "NODDLE DEVELOPMENT COMPANY or Nominee" also gives no assurance of personal liability on Noddle's part to perform—such reference to a "nominee" is a frequently-employed vehicle to put only a contract's earnest money at risk. And even were the two hedges discussed in the preceding paragraph and this paragraph not present, Avgeris' characterization of Noddle as a "nationally recognized developer" is no as-

---

8. This Court has found it disturbing that Schmitt Farm's inch-thick appendix submitted with its brief provided a photocopy *only* of the front of the Contract, not of its reverse side. Even though USAA's responsive brief made the point discussed in the text here, Schmitt Farm's reply brief (like its original brief) remained totally si-

lent on the subject—not even acknowledging that USAA was right in what it said about Noddle's total lack of personal liability. If viewed as the issuers of a prospectus in the form of its briefs and appendix, Schmitt Farm's counsel would have violated the securities laws and Rule 10b–5.

surance whatever that Noddle has the wherewithal to consummate an $11 million deal.

4. Even apart from its patent character as a purely contingent document (or at least one containing no firm commitment on Noddle's part to purchase), the Contract contains another express hedge in addition to the obvious and stated contingency of bankruptcy court approval: [9]

> This contract and closing is [sic] expressly subject to and contingent upon the City of Aurora approving at least $2,700,000.00 of sales tax increment assistance to the development.

Closing under the Contract was required to be made within 180 days. All that Schmitt Farm tendered at the hearing before Judge James as to the prospect of tax increment financing ("TIF") was Avgeris' optimism, not required to be credited by Judge James.[10] Nor was the Judge required to give credence to Avgeris' airy statement that if the required TIF were not available the Contract price could be renegotiated to a price that would still pay off the USAA loan.[11]

Schmitt Farm can beat the drums all that it wishes as to Avgeris' testimony being "unrebutted" and "uncontradicted." Surely it cannot be considered clearly erroneous for an objective and informed observer—Judge James in the court below, and here this Court as well—to find that Schmitt Farm's Chapter 11 filing, followed 60 days later by nothing more than the just-described Contract, reflected bad faith in the bankruptcy sense. Whether the absence of hard evidence of any prospects of reorganization (to say nothing of the absence of any persuasive showing of real value in the Property over and above USAA's mortgage) were to be measured in terms of the 15 or more months since the foreclosure proceedings began (hardly an illogical perspective), or in terms of the few months that have elapsed since the Chapter 11 filing, the speculative and iffy nature of what Schmitt Farm came up with justifies Judge James' finding that Schmitt Farm had no good faith prospect of reorganization when it further frustrated the foreclosure by making that filing (accord, *In re Northland Construction Co.*, 560 F.2d 756, 760 (7th Cir.1977)).

Despite Schmitt Farm's vigorous protest that Judge James operated on a "mechanical basis," it offers nothing substantive—only its own unsupported high hopes—to negate the bankruptcy judge's findings and conclusions. Judge James accurately identified the presence here of every factor spoken of in the course of *In re Little Creek Development Co.*, 779 F.2d 1068 (5th Cir.1986), the Fifth Circuit's analysis of a like bad faith filing. It takes only a recitation of those factors to demonstrate how startlingly applicable they are to the current case (*id.* at 1072–73):

> Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except for the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a standstill in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of the property.

**9.** At least *that* contingency was disclosed to this Court by the photocopy in the Appendix.

**10.** Nothing came from the Aurora authorities in that respect—just Avgeris' say-so about what he believed Aurora was likely to do.

**11.** Nothing came from Noddle in that respect—again just Avgeris' say-so about what he believed some future negotiations would generate.

But Judge James did not simply parrot a formulaic treatment of the matter. Before he went on to match up Schmitt Farm's situation with those factors, he had quoted with approval (Tr. 168) this language from *Little Creek Development,* 779 F.2d at 1072 that preceded the Fifth Circuit's statement of relevant factors:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum.

All of the realities of the Schmitt Farm filing, not just a mechanistic application of a formula, support Judge James' determination (*Love,* 957 F.2d at 1355). Schmitt Farm has failed even what its own statement of the bad faith standard would demand: "whether there is a reasonable prospect of successful reorganization within a reasonable time" (its Mem. 14).

Repetition of an already-familiar theme becomes boring as well as unnecessary. There is no way in which Judge James' determination of Schmitt Farm's lack of good faith can be labeled as "clearly erroneous."

### *"New Debtor" Syndrome*

Although Judge James did not find it necessary to go on to rule, as an independent ground, on USAA's contention that Schmitt Farm's acquisition of the Property was legally vulnerable, that contention provides added support for the result reached below. This opinion has already adverted to the nature and effect of the transaction by which Schmitt Farm received the assignment of beneficial interest in the Property. Those factors bear some elaboration in terms of bankruptcy case doctrine.

Bankruptcy provides substantial benefits to parties in financial distress. It may give additional time and relieve immediate pressures to permit the realization of values that are really present, but that cannot be taken advantage of without the protection that a bankruptcy court can afford. But those benefits must be purchased at the price of submitting *all* of the debtor's assets to the bankruptcy administration, so that creditors do not run the risk of being shortchanged.

■ So it is that courts have developed what has come to be known as the "new debtor syndrome," under which specific assets cannot be segregated and made the subject of bankruptcy filing that places in a more precarious position the creditor that is thus limited to an interest in those assets (and not all of the other assets of the debtor). That doctrine was explicated at length in *N.R. Guaranteed Retirement,* 112 B.R. at 273–76 and formed the basis for relief to the creditor there, *id.* at 277–79, *aff'd,* 119 B.R. at 153–56.

■ Judge James did suggest that principle as a possible alternate ground for his decision—and this Court does more: It expressly finds that doctrine separately supports the lifting of the stay. Schmitt Farm's very creation, when followed by its Chapter 11 filing, operated to deprive USAA of access to the millions of dollars of equity in Orchard Valley if USAA could not recover full payment out of the proceeds of sale of the Property—an access that USAA would have had in the event of an Orchard Valley Chapter 11 filing, the only other way in which USAA's foreclosure action could have been forestalled. That independently buttresses Judge James' decision that the Schmitt Farm Chapter 11 filing lacked good faith.

### *Schmitt Farm's Lack of Ownership*

■ Still another flaw in Schmitt Farm's position may alternatively be thought of either as supplemental to the just-described "new debtor" issue or as a separate ground for lifting the stay. As already stated, the assignment of beneficial interest that Schmitt Farm received from Orchard Valley was not a perfected transfer because of its noncompliance with the Land Trust Agreement:

> No assignment of any beneficial interest hereunder shall be binding on the trustee until the original or executed duplicate of the assignment is delivered by the trustee,

in form satisfactory to it and accepted by it in writing. . . .

USAA's lack of approval of the attempted assignment caused the Trustee to refuse such acceptance—a lack of approval that was fully justified by Section 17.01 of USAA's mortgage:

> Except as may be otherwise provided in Article XIII of the Agreement [12] or in the Transfer Restrictions Agreement,[13] Mortgagor shall not transfer, sell, convey or assign (by operation of law or otherwise) the Mortgaged Property or all or any part of the beneficial interest therein without the prior written approval of Mortgagee.

 Schmitt Farm misses the point entirely by arguing that under Illinois law a claimed assignment of beneficial interest is valid as between the assignor and assignee. So much is of course true, but so what? After all, the dispute here is *not* one between those two parties (in which event that doctrine would be relevant). Instead the controlling factors are these:

1. Because the transfer is not valid and binding *as to USAA,* it has standing to object that Schmitt Farm does not *own* the Property so as to enable it to invoke the Code's protection. At most Schmitt Farm would own a claim against its assignor Orchard Valley, unenforceable as against USAA.

2. Even were that not so, the purported Contract with Noddle (as flawed as it is) is really invalid as an agreement binding the Property to begin with. Avgeris signed that Contract as the claimed "agent" for Merchants National Bank. But with his principal (Schmitt Farm) not being the beneficial owner vis-a-vis that Bank as Trustee, neither Schmitt Farm nor Avgeris had any authority to act or sign for the Land Trust. Merchants National Bank would have no duty to honor the Contract by conveying the Property, just as it has no duty to honor the assignment of beneficial interest to Schmitt Farm.

Accordingly it seems clear that the only even arguable support for Schmitt Farm's position, the Contract (an inadequate prop for other reasons, as already demonstrated), is itself ineffective in contractual terms. But it should once more be stressed that this added fillip is only that—it is really unnecessary to justify the result reached here.

### Conclusion

From whatever perspective Judge James' decision is viewed, it is sound. It is truly an understatement to characterize his determination as not being "clearly erroneous." In fact it is entirely free from error, and Judge James' decision is affirmed.

---

**12.** [Footnote by this Court] That reference is to the transaction by which USAA originally sold the Property to Primus. That provision allowed Primus to assign that purchase contract *before* its closing, and has no relevance here.

**13.** [Footnote by this Court] Those restrictions also provide no warrant for the transfer to

Schmitt Farm, among other reasons because any permission to transfer under that document required that the note and mortgage not be in default at the time—clearly not true in this case.

438

EXHIBIT 1

CHICAGO TI~~ ~SURANCE COMPANY - ILLINOIS FORM B

# Real Estate Sales Contract

1. _____ NODDLE DEVELOPMENT COMPANY or Nominee _____ (Purchaser)
agrees to purchase at a price of $ $10,968,315.00 _____ on the terms set forth herein, the following described real estate
in _____ Kane _____ County, Illinois: (Legal Description to be attached
as Exhibit "A" by Purchaser's attorney upon receipt of Title Commitment pursuant
to Item 1 of Conditions and Stipulations.)

commonly known as Northwest Corner of Orchard road and Indian Trail Rd.; and with approximate lot dimensions of 50.40 acres.
_____ x _____ , together with the following property presently located thereon:

2. Merchants National Bank of Aurora, Trust No. 4481 _____ (Seller)
agrees to sell the real estate and the property described above, if any, at the price and terms set forth herein, and to convey or cause to be conveyed to
Purchaser or nominee title thereto by a recordable Trustee's dead, with release of homestead rights, if any, and a proper bill of sale,
subject only to: (a) covenants, conditions and restrictions of record; (b) private, public and utility easements and roads and highways, if any; (c) party
wall rights and agreements, if any; (d) existing leases and tenancies (as listed in Schedule A attached); (e) special taxes or assessments for improvements
not yet completed; (f) installments not due at the date hereof of any special tax or assessment for improvements heretofore completed; (g) mortgage or
trust deed specified below, if any; (h) general taxes for the year 1992 and subsequent years including taxes which may accrue by reason of new or
additional improvements during the year(s) _____; and to exceptions listed on attached Exhibit "B"

3. Purchaser has paid $ 10,000.00 _____ as earnest money to be applied on the purchase price, and agrees to pay or satisfy the balance of
the purchase price, plus or minus prorations, at the time of closing as follows: (strike language and subparagraphs not applicable)

(a) The payment of $ $90,000.00 in 120 days and the balance at closing. Which $90,000.00 is
applicable but not refundable.

(b) The payment of $ _____ and the balance payable as follows:

_____

_____

~~to be evidenced by the note of Purchaser (grantee), providing for full prepayment privilege without penalty, which shall be secured by a~~
part-purchase money mortgage (trust deed), the latter instrument and the note to be in the form hereto attached as Schedule B, or in the absence of
this attachment, the forms prepared by _____ and identified as Nos. _____ ** and
by a security agreement (as to which Purchaser will execute or cause to be executed such financing statements as may be required under the Uniform
Commercial Code in order to make the lien created thereunder effective), and an assignment of rents, said security agreement and assignment of rents
to be in the forms appended hereto as Schedules C and D. Purchaser shall furnish to Seller an American Land Title Association loan policy insuring
the mortgage (trust deed) issued by the Chicago Title Insurance Company.

(**If a Schedule B is not attached and the blanks are not filled in, the note shall be secured by a trust deed, and the note and trust deed shall be in
the forms used by the Chicago Title and Trust Company.)

~~(c) The acceptance of the title to the real estate by Purchaser subject to a mortgage or trust deed of record securing a principal indebtedness (which the~~
Purchaser [does] [does not] agree to assume] aggregating $ _____ bearing interest at the rate of _____ % a year and the
payment of a sum which represents the difference between the amount due on the indebtedness at the time of closing and the balance of the
purchase price.

4 Seller/at his own expense, agrees to furnish Purchaser a current plat of survey of the above real estate made, and so certified by the surveyor as having 45 days prior to closing.
been made, in compliance with the Illinois Land Survey Standards

5. The time of closing shall be on 180 days after the date hereof or on the date, if any, to which such time is extended by reason of paragraphs 2 or 10 of
the Conditions and Stipulations hereafter becoming operative (whichever date is later), unless subsequently mutually agreed otherwise, at the office of
Chicago Title & Trust Co. or of the mortgage lender if any provided title is shown to be good or is accepted by Purchaser
111 W. Washington
Chicago, IL 60602
6 Seller agrees to pay a broker's commission to Avgeris & Associates, Inc.
~~in the amount set forth in the broker's listing contract or as follows~~ _____

7 The earnest money shall be held by _____ Chicago Title & Trust Co. _____
for the mutual benefit of the parties.
Beneficiaries of
8 / Seller warrants that Seller, its beneficiaries or agents of Seller or of its beneficiaries have received no notices from any city, village or other
governmental authority of zoning, building, fire or health code violations in respect to the real estate that have not been heretofore corrected

~~9. A duplicate original of this contract, duly executed by the Seller and his spouse, if any, shall be delivered to the Purchaser within _____ days from~~
~~the date hereof, otherwise, at the Purchaser's option, this contract shall become null and void and the earnest money shall be refunded to the Purchaser~~

This contract is subject to the Conditions and Stipulations set forth on the back page hereof, which Conditions and Stipulations are made a part of this
contract

Dated July 29, 1993

DEBTOR'S EXHIBIT **EXHIBIT 11**

NODDLE DEVELOPMENT COMPANY
Purchaser BY: _____

Purchaser _____ (Address) _____

Seller MERCHANTS NATIONAL BANK OF AURORA (Address) c/o Lawrence H. Freedman
under Trust No. 4481 Ash, Anos Freedman & Logan
Seller BY: _____ -agent (Address) 77 W. Washington ST. - Suite 1211
Chicago, IL 60602

*Firm normally used for sale or property approved with multi-family structures of five or more units or of commercial or industrial properties

## CONDITIONS AND STIPULATIONS

Seller shall deliver or cause to be delivered to Purchaser or Purchaser's agent, not less than 5 days prior to the time of closing, the plat of survey (if one is required to be delivered under the terms of this contract) and a title commitment for an owner's title insurance policy issued by the Chicago Title Insurance Company, *or another title insurer acceptable to Purchaser (the "title insurer")* in the amount of the purchase price, covering title to the real estate on or after the date hereof, showing title in the intended grantor subject only to (a) the general exceptions contained in the policy, (b) the title exceptions set forth above, and (c) title exceptions pertaining to liens or encumbrances of a definite or ascertainable amount which may be removed by the payment of money at the time of closing and which the Seller may so remove at that time by using the funds to be paid upon the delivery of the deed (all of which are herein referred to as the permitted exceptions). The title commitment shall be conclusive evidence of good title as therein shown as to all matters insured by the policy, subject only to the exceptions as therein stated. Seller also shall furnish Purchaser an affidavit of title in customary form covering the date of closing and showing title in Seller subject only to the permitted exceptions in foregoing items (b) and (c) and unpermitted exceptions or defects in the title disclosed by the survey, if any, as to which the title insurer commits to extend insurance in the manner specified in paragraph 2 below.

2 If the title commitment or plat of survey (if one is required to be delivered under the terms of this contract) discloses either unpermitted exceptions or survey matters that render the title unmarketable (herein referred to as "survey defects"), Seller shall have 30 days from the date of delivery thereof to have the exceptions removed from the commitment or to correct such survey defects or to have the title insurer commit to insure against loss or damage that may be occasioned by such exceptions or survey defects, and, in such event, the time of closing shall be 35 days after delivery of the commitment or the time expressly specified in paragraph 5 on the front page hereof, whichever is later. If Seller fails to have the exceptions removed or correct any survey defects, or in the alternative, to obtain the commitment for title insurance specified above as to such exceptions or survey defects within the specified time, Purchaser may terminate this contract or may elect, upon notice to Seller within 10 days after the expiration of the 30-day period, to take title as it then is with the right to deduct from the purchase , 'ce liens or encumbrances of a definite or ascertainable amount. If Purchaser does not so elect, this contract shall become null and void without further action of the parties.

3 Rents, premiums under assignable insurance policies, water and other utility charges, fuels, prepaid service contracts, general taxes, accrued interest on mortgage indebtedness, if any, and other similar items shall be adjusted ratably as of the time of closing. The amount of the current general taxes not then ascertainable shall be adjusted on the basis of (a), (b), or (c) below *(Strike subparagraphs not applicable)*:

(a) __110__ % of the most recent ascertainable taxes;

~~(b) The most recent ascertainable taxes and subsequent readjustment thereof pursuant to the terms of reproration letter attached hereto and incorporated herein by reference.~~

~~(c) (Other) _____~~

~~_____~~

~~The amount of any general taxes which may accrue by reason of new or additional improvements shall be adjusted as follows: _____~~

~~_____~~

~~All prorations are final unless otherwise provided herein. Existing leases and assignable insurance policies, if any, shall then be assigned to Purchaser.~~ *or county ordinance Purchaser* *to the* Seller shall pay the amount of any stamp tax imposed by State law on the transfer of the title, and/shall furnish a completed Real Estate Transfer Declaration signed by the Seller or the Seller's agent in the form required pursuant to the Real Estate Transfer Tax Act of the State of Illinois and shall furnish any declaration signed by the Seller or the Seller's agent or meet other requirements as established by any local ordinance with regard to a transfer or transaction tax; such tax required by local ordinance shall be paid by the party upon whom such ordinance places responsib therefor. If such ordinance does not so place responsibility, the tax shall be paid by the (Purchaser) (Seller). *(Strike one.)*

4. The provisions of the Uniform Vendor and Purchaser Risk Act of the State of Illinois shall be applicable to this contract.

*within 120 days from the date hereof, and upon notice to Seller* 5. If this contract is terminated without Purchaser's fault, the earned money shall be returned to the Purchaser, but if the termination is caused by the *as Seller's sole and exclusive* Purchaser's fault, then at the option of the Seller and upon notice to the Purchaser, the earned money shall be forfeited to the Seller and applied first to the payment of Seller's expenses and then to payment of broker's commission; the balance, if any, to be returned by the Seller as liquidated damages. *remedy.*

6. At the election of Seller or Purchaser upon notice to the other party not less than 5 days prior to the time of closing, this sale shall be closed through an escrow with Chicago Title and Trust Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then in use by Chicago Title and Trust Company, with such special provisions inserted in the escrow agreement as may be required to conform with this contract. Upon the creation of such an escrow, anything herein to the contrary notwithstanding, payment of purchase price and delivery of deed shall be made through the escrow and this contract and the earnest money shall be deposited in the escrow. The cost of the escrow shall be divided equally between Seller and Purchaser. *(Strike paragraph if inapplicable.)*

7. Time is of the essence of this contract.

8. All notices herein required shall be in writing and shall be served on the parties at the addresses following their signatures. The mailing of a notice by registered or certified mail, return receipt requested, shall be sufficient service.

9. Alternative 1:
Seller represents that he is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code and is therefore exempt from the withholding requirements of said Section. Seller will furnish Purchaser at closing the Exemption Certification set forth in said Section.

Alternative 2:
Purchaser represents that the transaction is exempt from the withholding requirements of Section 1445 of the Internal Revenue Code because Purchaser intends to use the subject real estate as a qualifying residence under said Section and the sales price does not exceed $300,000.

Alternative 3:
With respect to Section 1445 of the Internal Revenue Code, the parties agree as follows: _____

_____

_____

*(Strike two of the three alternatives.)*

10 (A) Purchaser and Seller agree that the disclosure requirements of the Illinois Responsible Property Transfer Act (do) (do not) apply to the transfer contemplated by this contract. (If requirements do not apply, strike (B) and (C) below.)

(B) Seller agrees to execute and deliver to Purchaser and each mortgage lender of Purchaser such disclosure documents as may be required by the Illinois Responsible Property Transfer Act

(C) Purchaser agrees to notify Seller in writing of the name and post office address of each mortgage lender who has issued a commitment to finance the purchase hereunder, or any part thereof such notice shall be furnished within 10 days after issuance of any such commitment, but in no event less than 40 days prior to delivery of the deed hereunder unless waived by such lender or lenders. Purchaser further agrees to place of record, simultaneously with the deed recorded pursuant to this contract, any disclosure statement furnished to Purchaser pursuant to paragraph 10(B) and, within 30 days after delivery of the deed hereunder, to file a true and correct copy of said disclosure document with the Illinois Environmental Protection Agency.

RIDER ATTACHED HERETO AND MADE A PART OF REAL ESTATE
SALES CONTRACT DATED JULY 29, 1993 BY AND BETWEEN
NODDLE DEVELOPMENT, INC. A CORPORATION OR NOMINEE, AS
PURCHASER AND MERCHANTS NATIONAL BANK OF AURORA UNDER
TRUST NO. 4481, AS SELLER

11. This contract and closing is expressly subject to and contingent upon the City of Aurora approving at least $2,700,000.00 of sales tax increment assistance to the development.

12. This contract and closing is expressly subject to and contingent upon approval by United States Bankruptcy Court in proceedings pending as in Re: Schmitt Farms Partnership #93812008.

PURCHASER:

NODDLE DEVELOPMENT, INC.

BY: _____
 Executive Vice President

SELLER:

MERCHANTS NATIONAL BANK OF
AURORA, TRUST No. 4481

BY: _____